Mildred Frances Sands KRATZ and Walter Roehrs, Jr.

v.

Lowell F. KRATZ and Fred T. Cadmus, III.

Civ. A. No. 78–795.

United States District Court, E. D. Pennsylvania.

Aug. 23, 1979.

Lawrence Sager, Pottstown, Pa., for Mildred Kratz.

Arthur R. Shuman, Jr., Philadelphia, Pa., for Walter Roehrs, Jr.

William H. Mitman, Jr., West Chester, Pa., for Lowell Kratz.

Albert S. Shaw, Jr., Philadelphia, Pa., for Fred Cadmus.

OPINION

JOSEPH S. LORD, III, Chief Judge.

This is a suit to recover damages caused by the allegedly illegal interception of the plaintiffs' telephone communications by the defendants. The defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, and the plaintiffs have moved for summary judgment as to liability. For the following reasons, we will deny both motions.

I. *FACTS:*[1]

The plaintiff Mildred Kratz, and the defendant Lowell Kratz, were married in 1947. In 1975, Mildred filed for divorce, and though she and Lowell were estranged, they continued to live in the same house.[2]

Sometime in early 1976, Lowell began to suspect that Mildred was not giving him his telephone messages. He also became suspicious of his wife's extra-marital activities. He therefore asked his attorney, defendant

---

1. Unless otherwise noted, the facts of this case are not in dispute.

2. The divorce petition is still entangled in the legal process and Mildred and Lowell Kratz

Fred Cadmus, whether it would be legal for him to place a wiretap on his family phone.[3]

Cadmus claims to have researched the applicable Pennsylvania and federal electronic surveillance statutes, and to have discovered the cases of *Commonwealth v. Goldberg*, 208 Pa.Super. 513, 224 A.2d 91 (1966), and *Simpson v. Simpson*, 490 F.2d 803 (5th Cir.), *cert. denied*, 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974). From these cases Cadmus concluded that Lowell's proposed wiretapping would be legal under both Pennsylvania and federal law, and he so advised his client.[4]

Lowell hired one William Fitch to install the tap in February 1976. The tap was voice-activated, and recorded all incoming and outgoing calls. The tap intercepted Mildred's calls, and Lowell made notes of all his wife's conversations which he felt relevant to the divorce proceedings; he reported these conversations to Cadmus at least every other week.

From the wiretap, the defendants learned, among other things, that Mildred Kratz was involved in an extra-marital relationship with the plaintiff Walter Roehrs, and that the plaintiffs were planning to spend a week in London together. The defendants hired a private detective to follow the plaintiffs to London. As a result of what the defendants learned from the wiretap about the plaintiffs' relationship, Cadmus filed, on Lowell's behalf, a counter-suit for divorce.[5]

After the tap had been in place for several months, Lowell concluded that he had gathered enough information from the interceptions, and wanted to remove the tap from his phone. Cadmus advised him to leave the tap on so that they could gather more information about Mildred's "activities" to use in the divorce proceedings.

In July 1976, Mildred experienced difficulties with the phone and called the telephone company for repairs. The phone company's repair people discovered the tap and reported it to the police.[6] Mildred Kratz and Walter Roehrs then each sued Lowell Kratz and Fred Cadmus for damages caused by the interception of their telephone communications;[7] the two cases have been consolidated.[8]

remain married; however, they are no longer living together.

3. As Lowell recalls this conversation with Cadmus, the original purpose of the tap was merely to ensure that he would receive his own calls. As Cadmus recalls it, Lowell asked him about hiring a private detective to follow his wife. Cadmus told him that it would be too expensive, and then, according to Cadmus, Lowell asked about a wiretap. This difference in recollection is irrelevant, for it is clear that Lowell knew that any tap placed on his home phone would intercept his wife's calls. It is also undisputed that as soon as the tap was in place, Lowell began making notes of Mildred's conversations, reported these conversations to Cadmus, and kept the tap on his phone in order to intercept Mildred's calls.

4. By his own admission, deposition of Cadmus at 132, Cadmus did not at that time discover an opinion written by Judge Bechtle of *this* District, *Remington v. Remington*, 393 F.Supp. 898 (E.D.Pa.1975), discussed *infra*.

5. Pennsylvania's much-criticized divorce law does not permit "no-fault" divorce; thus, in order for Lowell to petition for divorce, he had to rely upon a statutory ground such as adultery. 23 P.S. § 10. The defendants admit that until Lowell intercepted his wife's telephone conversations, he lacked any basis on which to sue for divorce. *See, e. g.,* June 29, 1978 Statement of Fred Cadmus to State Police Trooper March, at 8.

6. When the police learned the origin of the tap, they arrested Lowell, and charged him with violating Pennsylvania's electronic surveillance statute. He was represented at trial by Cadmus, and was convicted. On appeal, Lowell was represented by a different attorney, his conviction was reversed on non-meritorious grounds, and a new trial was ordered. Lowell has filed a cross-claim against Fred Cadmus for indemnification and malpractice. We have already denied Cadmus's motion to strike this cross-claim.

7. The complaints also allege interception of the plaintiffs' "oral" (as distinct from "wire") communications, but the plaintiffs have presented no evidence on such interception. We therefore concern ourselves only with the defendants' interception of the plaintiffs' wire communications.

8. Roehrs also named as a "John Doe" defendant the as-then unknown installer of the wiretap, now identified as William Fitch. He has not, however, pursued any claims against Fitch.

## II. THE DEFENDANTS' MOTION TO DISMISS:

### A. Introduction

The plaintiffs have brought this suit pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, ("Title III"), 18 U.S.C. §§ 2510–2520. Specifically, they allege that the defendants have violated 18 U.S.C. § 2511(1)(a) which decrees that:

> "(1) Except as otherwise *specifically provided* in this chapter *any person* who—
>
> (a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication; . . . shall be fined not more than $10,000 or imprisoned not more than 5 years or both."

(emphasis added).[9] The plaintiffs' cause of action is provided by 18 U.S.C. § 2520, which in pertinent part states that:

> "Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recover from any such person—
>
> (a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;
>
> (b) punitive damages; and
>
> (c) a reasonable attorney's fee and other litigation costs reasonably incurred."

■ The basis of the defendants' motion to dismiss is their claim that Congress, in enacting Title III, did not intend to prohibit one spouse from intercepting the wire communications of the other spouse in their own home. However, the plain and explicit language of Title III effectively refutes the defendants' argument. The clear and unambiguous meaning of § 2511(1)(a) is to prohibit the interception of *all* wire communications by *any* person except as *specifically* provided by Congress. And § 2520 plainly provides a cause of action to *any* person who is the victim of a § 2511(1)(a) violation.

■ In addition, the statute defines "person" as "any employee, or agent of the United States or any State or political subdivision thereof, *and any individual,* partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6) (emphasis added). This definition unquestionably includes the defendants. And since none of the exceptions to the proscriptions of § 2511(1)(a) is relevant to this case, *see* 18 U.S.C. §§ 2511(2) and (3), the statute clearly is applicable. Furthermore, when Congress has enacted a statute in such unambiguously inclusive language, *and* has listed *specifically* the exceptions to that statute's prohibitions, the only rational conclusion which a court can draw is that the statute means what it says, and prohibits *all* interceptions of wire communications, by *any* person, unless otherwise *expressly* provided.

Nevertheless, say the defendants, although the comprehensive and unambiguous language of Title III renders it applicable to the instant case, the statute is in fact inapplicable because there is no specific indication in its legislative history that Congress intended it to apply to cases such as ours. We would summarily dismiss such a fallacious approach to statutory interpretation had it not been the one adopted by the Fifth Circuit Court of Appeals in *Simpson v. Simpson,* 490 F.2d 803 (5th Cir.), *cert. denied,* 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974).

In that case, the defendant husband, "[h]arboring uncertainties as to his wife's

---

**9.** The plaintiffs accuse Lowell of intercepting their telephone conversations and Cadmus of procuring the interceptions by advising Lowell that they would be legal, by participating in the entire scheme, and also by instructing Lowell to leave the wiretap on when Lowell expressed a desire to remove it. Also, the plaintiffs allege that Lowell disclosed, and both defendants used, the contents of their conversations in violation of 18 U.S.C. §§ 2511(1)(c) and (1)(d). We will discuss specific substantive liability in Section III, *infra.*

faithfulness," attached a wiretapping device to his family phone, and intercepted his wife's telephone conversations. He used the information learned from this surveillance to obtain an uncontested divorce. His wife then sued him for damages under 18 U.S.C. § 2520. The Fifth Circuit, in a unanimous opinion written by then-Judge (and now former Attorney General) Griffin Bell, affirmed the lower court's dismissal of the suit and held that Title III does not proscribe the interception by one spouse of the other's telephone communications in the marital home. Because the defendants rely heavily upon *Simpson* and because we feel compelled to disagree with and reject that opinion, a somewhat detailed analysis of the holding is appropriate.

### B. *Simpson v. Simpson*

#### (1) *Resort to legislative history.*

Judge Bell began his opinion by recognizing that the "naked language of Title III, by virtue of its inclusiveness, reaches this case." 490 F.2d at 805. Despite such language, he refused to "extend" Title III to the *Simpson* facts absent a positive expression of congressional intent (in the legislative history) to include such cases within the ambit of the statute. Judge Bell's reluctance stemmmed from his perception of Title III as creating a novel "federal remedy for persons aggrieved by the personal acts of their spouses within the marital home" and as providing "severe" remedies for such acts. *Id.* at 805–806.

Judge Bell therefore embarked upon a "voyage to seek congressional intent for the 'naked' language of section 2520 by reviewing the legislative history, hearings, and debate. . . ." Comment, *Interspousal Electronic Surveillance Immunity*, 7 U. of Tol.L.Rev. 185, 200 (1975) [hereinafter cited as *Interspousal Surveillance*]. His travels through the legislative history of Title III convinced him that "Congress has not, in the statute, committee reports, legislative

hearings, or reported debates indicated either its positive intent to reach so far [into the marital home] or an awareness that it might be doing so." 490 F.2d at 805. Judge Bell summarized his "search of [the] legislative materials" as "long, exhaustive, and inconclusive" with respect to Congress's intention to include "interspousal wiretapping" [10] within the proscriptions of Title III. Therefore, he held that Title III was not "sufficiently definite and specific to create a federal cause of action for the redress of appellant's grievances against her former husband." *Id.* at 810.

It is difficult to imagine a statutory prohibition more "definite and specific" than that of § 2511(1)(a). Even assuming, *arguendo*, that Judge Bell's reading of Title III's legislative history was correct, the result reached in *Simpson* was erroneous, and a product of Judge Bell's most unusual and improper method of statutory analysis. In *Simpson*, Judge Bell seized upon an admittedly "inconclusive" legislative history as a reason for holding a statute inapplicable to a situation clearly encompassed by that statute's plain and unambiguous language. As a result, Judge Bell created, of his own accord, an exception to Title III not found in the statute, and did so in flagrant disregard of 18 U.S.C. § 2511(1), which states that all exceptions to Title III have been *provided specifically* in the statute.

■■■ Judge Bell reached the result he did by ignoring traditional principles of statutory interpretation. First, he failed to heed the maxim that "[o]rdinarily a court will not refer to legislative history in construing a statute which is clear on its face. *See e. g., United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 . . (1961)." *United States v. Jones*, 542 F.2d 661, 667 (6th Cir. 1976). The reason for this fundamental precept is obvious; the function of a court in interpreting a statute is to determine the intent of Congress in enacting the statute and to give effect to that intent. *United States v. American Truck-*

---

10. . We use this phrase merely as a shorthand description of electronic surveillance directed by an individual against his or her spouse. It is not a completely accurate phrase in that it does

not describe the interception of the communications of third parties with the targeted spouse. Mildred Kratz, of course, was not talking to herself on the telephone.

*ing Ass'ns, Inc.,* 310 U.S. 534, 542, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). "[B]eyond doubt, the best evidence of that intent is the text of the statute itself." *Patagonia Corp. v. Board of Governors of Federal Reserve System,* 517 F.2d 803, 813 (9th Cir. 1975). *Accord, United States v. Allen,* 574 F.2d 435, 438 (8th Cir. 1978); *Sierra Club v. Train,* 557 F.2d 485, 489 (5th Cir. 1977). Thus, when the text of a statute is unambiguous, it is unnecessary for a court to go beyond the statute in search of "meaning" for its language.

We recognize, of course, that there may be circumstances in which a literal reading of a statute might conflict with, and must then yield to, a "clear contrary evidence of legislative intent". *National R. Passenger Corp. v. National Ass'n of R. Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). It must thus be permissible for "a court . . . [to] use available aids to construction no matter how clear the statute may appear at first inspection." *Brigham v. United States,* 539 F.2d 1312, 1316 n.8 (3d Cir. 1976).

However, " 'the plainer the language [of a statute], the more convincing contrary legislative history must be' to overcome the natural purport of a statute's language." C. Sands, *Sutherland's Statutory Construction* § 48.01 at 21 (4th ed. Cum. Supp.1979) [*quoting United States v. United States Steel Corp.,* 482 F.2d 439, 444 (7th Cir.), *cert. denied,* 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147 (1973)]. This last rule prescribing caution in the use of legislative history as an interpretive tool is a salutary one, for legislative history is at best an imprecise barometer of congressional in-

tent. Hundreds of persons are involved in the writing and ultimate enactment of a statute, and they may have many different opinions as to the meaning of the statute they have created. A statute's legislative history will likely reflect the differences in motive and intent of its framers, and the statements made in congressional hearings, debates and reports, by witnesses and legislators alike, may be susceptible of varying interpretations.[11]

On the other hand, the statute itself, as enacted, is the unitary voice of the legislative body. Therefore, when the statutory language is unambiguous, its "plain words and meaning . . . cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction." *Gemsco v. Walling,* 324 U.S. 244, 260, 65 S.Ct. 605, 614, 89 L.Ed. 921 (1945). As our Court of Appeals recently has cautioned, "[w]here the statutory language is unambiguous, . . . the legislative history would have to point *emphatically* to a different construction before the courts could rewrite the law." *United States v. Wander,* 601 F.2d 1251 at 1258 (3d Cir. 1979) (emphasis added).

When a statute is as clearly comprehensive as Title III, and when its exceptions are *specifically* defined, it is improper for a court, relying upon an "inconclusive" legislative history, to read into that statute an exception not contained therein. Yet that is precisely what Judge Bell did in *Simpson.* In effect, the *Simpson* court engaged in judicial legislation by reading the plain words of Title III ("any person") to mean

---

11. Indeed,

"[b]ecause legislative history is itself often ambiguous and inconclusive, there is support for the view that it should not be considered for the reason that when a court purports to decide an issue of statutory construction on historical grounds it in fact indulges in judicial legislation in the course of judging as to the pertinence and probative force of the historical evidence. As declared by United States Supreme Court Justice Robert Jackson in support of a preference for making decisions 'by analysis of the statute instead of by psychoanalysis of Congress:' 'When we

decide from legislative history, including statements of witnesses at hearings, what Congress probably had in mind, we must put ourselves in the place of a majority of Congressmen and act according to the impression we think this history should have made on them . . . .. That process seems to me to be not interpretation of a statute but creation of a statute.' "

C. Sands, *Sutherland's Statutory Construction,* § 48.02 at 186–87 (4th ed. 1973) [*quoting United States v. Public Utilities Commission of California,* 345 U.S. 295, 319, 73 S.Ct. 706, 97 L.Ed. 1020 (1953) (Jackson, J., concurring)].

something other than what they said. But judges are not legislators, and this Humpty-Dumpty [12] method of jurisprudence has no place in our constitutional system. An invitation to engage in such judicial legislation was properly rejected decades ago in the analogous case of *United States v. Gruber*, 39 F.Supp. 291 (S.D.N.Y.1941), a prosecution brought under the Federal Communications Act of 1934 (a forerunner of Title III). The applicable statute, 47 U.S.C. § 605, was written in plain language:

> "*no person* . . . shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person . . ."

(emphasis added). Nevertheless, the defendants argued that the statute prohibited the interception of telephone communications *only* by employees of common carriers engaged in interstate communications. In rejecting this argument, the court recognized that:

> "[T]he statute states 'no person . .', and 'person' is defined as anyone including an individual . . . The language of the statute is so plain, that to construe it as the defendants request would be tantamount to inserting something in the statute which is not there. It is not the province of the courts to misconstrue plain language; nor is there any excuse, where there is no ambiguity, for not taking the words in their accepted meaning."

39 F.Supp. at 294.

*(2) Interpretation of legislative history.*

That Judge Bell plainly inserted "something in . . . [Title III] which is not

there" was error enough, assuming that its legislative history was indeed "inconclusive". But we agree with the Sixth Circuit that Judge Bell was wrong in his analysis of the legislative history. *See United States v. Jones*, 542 F.2d 661 (6th Cir. 1976). We therefore join that court in rejecting *Simpson* as "untenable because it contradicts *both* the explicit language of the statute *and* the clear intent of Congress [as] expressed in the Act's legislative history." 542 F.2d at 667. (emphasis added).[13] That history is not "inconclusive", but evinces a congressional awareness of the widespread use of electronic eavesdropping in domestic relations cases, *and* a congressional intent to prohibit such eavesdropping.

As the Supreme Court recognized in *United States v. Giordano*, 416 U.S. 505, 514, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974), "[t]he purpose of the legislation [Title III] . . . was effectively to prohibit . . . *all* interceptions of oral and wire communications, *except those specifically provided for in the Act* . . ." (emphasis added). The legislative history reinforces this conclusion. It is clear from S.Rep.No. 1097, 90th Cong., 2nd Sess., *reprinted in* [1968] U.S.Code Cong. & Admin. News, at 2112, that Title III was intended to provide a comprehensive proscription of electronic surveillance, applicable not only to law enforcement officials acting without warrants, but to *all private persons* (unless specifically provided).[14]

And it is also clear, even from the portions of legislative history cited in *Simpson*, that Congress was fully aware of the fact

---

12. "When *I* use a word," Humpty-Dumpty said, "it means just what I choose it to mean—neither more nor less." L. Carroll, Through the Looking-Glass and What Alice Found There, Ch. VI (1871), *in* The Annotated Alice 269 (M. Gardner ed. 1960).

13. In *Jones*, the court reversed the dismissal of an indictment charging the defendant with violating Title III by intercepting the telephone conversations of his estranged wife. The District Court had relied principally on *Simpson* in dismissing the case, but the Sixth Circuit strongly disagreed with and declined to follow *Simpson*. Alternatively, the court distin-

guished *Simpson* on its facts, (in *Jones* the husband and wife no longer shared a residence), and on the basis that *Simpson* was a civil case and thus concerned (although erroneously) with interspousal immunity.

14. For example, the Senate Report states that 18 U.S.C. § 2511(1)(a) "establishes a blanket prohibition against the interception of any wire communication." S.Rep.No. 1097, [1968] U.S. Code Cong. & Admin.News, at 2180. Also, the Report explains that the definition of "person" in 18 U.S.C. § 2510(6) "is intended to be comprehensive." *Id.* at 2179.

that domestic relations cases constituted one of the major areas in which private electronic surveillance was employed. For example, during the *Hearings on Invasion of Privacy Before the Subcommittee on Administrative Practice & Procedure of the Senate Judiciary Committee*, 89th Cong., 1st Sess., part 5 at 2261 (1965–1966), Senator Long, the Chairman of the subcommittee, noted that the three major areas in which private electronic surveillance was widespread were "(1) industrial (2) divorce cases, and (3) politics." And Richard Gerstein, District Attorney of Dade County, Florida, testified before the subcommittee that "it is routine procedure in marital disagreements and other civil disputes for private detective agencies, generally with full knowledge of the lawyers, to tap telephones." *Id.* part II at 1009.

In the 1967 congressional hearings, Professor Robert Blakey, who is generally credited with being the author of Title III, testified that "private bugging in this country can be divided into two broad categories, commercial espionage and marital litigation." *Hearings on The Right to Privacy Act of 1967 Before the Subcommittee on Administrative Practice & Procedure of the Senate Judiciary Committee*, 90th Cong., 1st Sess., part II at 413 (1967).[15] Plainly, Congress was well aware that electronic surveillance was widely employed to gather evidence for use in divorce cases.

In *Simpson*, Judge Bell conceded that Congress intended Title III to prohibit wiretapping engaged in by private persons. However, he concluded from the above legislative history that Congress meant to prohibit electronic eavesdropping in marital re-

lations cases only by private detectives but not by the spouses who hired them. He reasoned that "a third-party intrusion into the marital home, even if instigated by one spouse, is an offense against a spouse's privacy of a much greater magnitude than is personal surveillance by the other spouse." 490 F.2d at 809. This distinction between "unaided surveillance by a spouse and surveillance involving a third-party, even if instigated by the spouse . . . is a classic 'distinction without a difference'." *Jones*, 542 F.2d at 670. The distinction ignores the very purpose of Title III, which is to protect individual privacy by prohibiting *all* electronic surveillance except as otherwise specifically provided.[16] As the *Jones* court recognized,

"For purposes of federal wiretap law, it makes no difference whether a wiretap is placed on a telephone by a spouse or by a private detective in the spouse's employ. The end result is the same—the privacy of the unconsenting parties to the intercepted conversation has been invaded. It is important to recognize [as Judge Bell did not] that it is not just the privacy of the targeted spouse which is being violated, but that of the other party to the conversation as well."

542 F.2d at 670 (bracketed material added, footnote omitted).[17]

Also, we note that a private detective hired by one spouse to intercept the telephone conversations of the other spouse has little or no interest in the content of the intercepted communications. The information obtained from the tap is not to be used for the benefit of the detective, but for that

---

**15.** See *United States v. Jones*, 542 F.2d 661, 668–69, for other passages from the legislative history illustrating a congressional awareness of the widespread use of electronic surveillance in domestic relations cases.

**16.** Of course, implicit in *Simpson* is a belief that one spouse has little or no justifiable expectation of privacy vis-a-vis the other. This flaw in the opinion is discussed *infra*.

**17.** As Justice Brandeis wisely explained, "Whenever a telephone line is tapped, the privacy of the persons at both ends of the

line is invaded, and all conversations between them upon any subject, and although proper, confidential, and privileged, may be overheard. Moreover, the tapping of one man's telephone line involves the tapping of the telephone of every other person whom he may call, or who may call him." *Olmstead v. United States*, 277 U.S. 438, 475–76, 48 S.Ct. 564, 571, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

of the hiring spouse. "Private detective agencies are not philanthropic businesses. They are hired. Certainly, the role of these agencies play [sic] in electronic surveillance should not be condoned, but the conduct which is of utmost concern under Title III is electronic surveillance and it therefore makes no sense to be concerned with the aider of such conduct and not with the instigator." *Interspousal Surveillance,* at 208 n. 102.

Finally, it must be recognized that Title III prohibits "any person" not only from intercepting wire communications but also from *procuring* "any other person" to do so. "This suggests that Congress intended to ensnare not only the operative conducting an illegal surveillance but the spouse who hired him as well." *Jones,* 542 F.2d at 670 n. 17.

For all the above reasons, we believe it unjustifiable to conclude that Congress intended the prohibitions of Title III to apply to a private detective but not to the spouse who hired the detective.[18] If there is any doubt at all as to the meaning of the legislative history of Title III (and we think there is none) it should be laid to rest by the following opinion of Professor Blakey, obtained by an enterprising commentator who sought Professor Blakey's views of *Remington v. Remington,* 393 F.Supp. 898 (E.D.Pa.1975) [18a] and *Simpson.* In the words of Professor Blakey:

" 'The case [Remington] was correctly decided—as far as it went. The Fifth Circuit decision [Simpson] is the one that was incorrectly decided. *Title III was intended to mean what it says—no surveillance by third parties without warrant—by* cops, *spouses,* or in business-labor or any other relevant relations.' Correspondence from Prof. G. Robert Blakey to William J. Holt, Sept. 2, 1975."

*Interspousal Surveillance,* at 205 n. 85 (emphasis added, bracketed material in original).

In addition to its misreading of the legislative history and its blatant disregard of the explicit language of Title III, *Simpson* contains two other material flaws. Since the erroneous reasoning which produced these flaws has been advanced by the defendants in our case, we must discuss it.

### (3) Expectation of privacy.

First, as mentioned in footnote 16, *supra,* implicit in *Simpson* is Judge Bell's assumption that one spouse has little or no justifiable expectation of privacy vis-a-vis the other spouse within the marital home. 490 F.2d at 809. Even if this assumption were correct, it is irrelevant for the purposes of Title III.

The statute draws a significant distinction between "wire" and "oral" communications in that it defines "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2). The definition of "wire" communication [19] con-

---

**18.** The *Simpson* distinction between aided and unaided surveillance has been interpreted in another manner. In *Remington v. Remington,* 393 F.Supp. 898 (E.D.Pa.1975), Judge Bechtle permitted a husband to maintain a § 2520 suit against his wife for her interception of his telephone communications. In so doing, Judge Bechtle distinguished *Simpson* by noting that the wife in this case had involved third parties (a detective agency) in the installation of the wiretap and the monitoring of the calls, and had allegedly permitted her attorneys to listen to the tapes.

This holding we think creates an intolerable result in that it permits a person able to install a wiretap to intercept the conversations of his or her spouse with impunity, (the *Simpson* sce-

nario), while it imposes § 2520 liability upon a spouse who obtains assistance in installing a tap and hires others to do his or her dirty work. We do not think that Congress intended a person's liability under Title III to turn on his or her proficiency in electronics or financial ability to engage private detectives.

However, we note that *Remington* appears to be based on the alternative reasoning that Title III is applicable "by virtue of the inclusiveness of the statutory language", 393 F.Supp. at 901, and thus apparently rejects *Simpson.*

**18a.** *See* footnote 18, *supra.*

**19.** " '[W]ire communication' means any communication made in whole or in part through the use of facilities for the transmission of

tains no such phrase requiring the communication to have been made under circumstances justifying an expectation of privacy. Thus, a telephone call, which is a wire communication within this definition, "is protected by Title III regardless of whether the participants actually have any justifiable expectations of privacy." Fishman, *The Interception of Communications Without a Court Order: Title III, Consent, and the Expectation of Privacy*, 51 St. John's L.Rev. 41, 61 (1976).[20]

Therefore, whether or not Beverly Simpson or Mildred Kratz had any justifiable expectation of privacy[21] in the telephone calls made from or received in their own homes is irrelevant under Title III. Judge Bell indeed recognized this fact, 490 F.2d at 809 n. 15, but ignored it, preferring to ground his opinion upon the legally irrelevant distinction between "interspousal wiretapping" conducted by a private detective and that performed solely by the eavesdropping spouse.

Holding as we do that expectation of privacy is irrelevant, we need not comment on the unsupportable notion that privacy is somehow surrendered at the altar of marriage. Nor need we discuss the defendants' assertion that since the plaintiffs were using the Kratz family telephone to arrange their adulterous relationship, they did so at their own risk.

*(4) Extension phone analogy.*

▉ An additional flaw in *Simpson* slavishly parroted in the defendants' argument, is the court's reliance on Title III's so-called "extension phone exemption", 18 U.S.C. § 2510(5)(a). That provision of the statute excludes from the definition of an " 'electronic, mechanical, or other device' . . which can be used to intercept a wire . . communication"

"(a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business . . ."

The result of this definitional exemption is that eavesdropping accomplished by the use of such a telephone by a subscriber within the ordinary course of business is not prohibited by Title III. Judge Bell interpreted the extension phone exemption as follows:

"First, it is clear that Congress did not intend to prohibit a person from intercepting a family member's telephone conversations by use of an extension phone in the family home—subsection (5)(a)(i) of § 2510 directly covers this point. If there is a convincing distinction between this clearly acceptable overhear and the overhear accomplished by appellee, we fail to see it. In fact, we think the (5)(a)(i) exemption is indicative of Congress's intention to abjure from deciding a very intimate question of familial relations, that of the extent of privacy family members may expect within the home vis-a-vis each other."

490 F.2d at 809 (footnote omitted).

We disagree with the defendants' argument and with the *Simpson* court's conclusion. First, Judge Bell's reasoning that the extension phone exemption indicated a congressional intent to "abjure from deciding a very intimate question of familial relations" is illogical. When Congress enacted Title III, it was keenly aware of the use of electronic eavesdropping in domestic relations cases. The absence of a specific ex-

communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications." 18 U.S.C. § 2510(1).

20. *See, for example, United States v. Banks*, 374 F.Supp. 321, (D.S.D. 1974), in which the court

held that unauthorized government monitoring of telephone conversations occurring over a *party line* violated Title III.

21. The defendants' motion in our case is based in part upon their argument that Mildred Kratz had no justifiable expectation of privacy when she was carrying on an extra-marital affair from her own home.

ception in the statute relating to such cases can only mean that Congress intended to create *no* exception for such cases. It is absurd to conclude, as Judge Bell does, that Congress, although capable of defining exceptions to a prohibitory statute, *see* §§ 2511(2) and (3), would choose to create an "interspousal" exception in such a backhanded and vague manner.[22]

Second, in interpreting the extension phone exemption, Judge Bell noted that the one reference to this section in the legislative history was by a witness testifying at House hearings. That witness said, "I take it nobody wants to make it a crime for a father to listen in on his teenage daughter or some such related problem . . .. But this bill does not go to that and goes beyond that." *Hearings on the Anti-Crime Program, Before Subcommittee No. 5 of the House Judiciary Committee*, 90th Cong., 1st Sess., at 989 (1967) (testimony of Professor Herman Schwartz). Whatever Congress thought about the legal rights of minor children vis-a-vis their parents, this isolated statement by a witness at a congressional hearing certainly does not warrant the conclusion that Congress viewed husbands and wives as less than full equals before the law, or that Congress meant to abstain from prohibiting certain wrongs done by one spouse to the other.

As noted above, Judge Bell assumed that one spouse could legally eavesdrop on the telephone communications of the other spouse by means of an extension phone.[23] Our defendants have seized upon this assumption, and have argued that it would be unreasonable to hold Lowell Kratz liable for intercepting telephone communications by means of a wiretap when he could have intercepted those same communications legally by means of an extension phone.

Assuming for purposes of argument that such use of an extension phone would be legal, there is still a great difference between the invasion of privacy posed by that use, and that occasioned by a wiretap. This material difference indeed justifies a statutory distinction between the two forms of eavesdropping. Judge Bell stated that he could perceive no such difference, but we believe that he is incorrect.

"There are two vital distinctions between an extension phone and a wiretap as they are used to intercept private conversations—the degree of human supervision and the potential product. Extension phone eavesdropping requires the presence of the eavesdropper, and therefore human frailities [sic] such as hunger and sleep are limiting factors. Also, as should be obvious, detection is a real problem to the eavesdropper who uses an extension phone. All of this necessarily affects the product that can be realistically derived from this type of surveillance. In contrast, a wiretap depends upon a minimum of human supervision. After installation, only periodic visits might be needed for maintenance, and this, as well as the technical sophistication of a wiretap, dramatically reduces the danger of detection. The product of such a tap, if desired, can reflect all the conversations that occur through the phone at all hours of the day. Therefore, extension phone eavesdropping has such less potential for violating the privacy of the targeted party, and, . . . the privacy of innocent third parties, than a wiretap."

*Interspousal Surveillance*, at 205–06.

These great differences between eavesdropping by means of an extension phone and eavesdropping by means of a wiretap, which incidentally have been recognized by the defendant Kratz,[24] are sufficient for

---

**22.** In the words of the Sixth Circuit, "[i]f Congress had intended to create another exception to Title III's blanket prohibition of unauthorized wiretaps they would have included a specific exception for interspousal wiretaps in the statute." *Jones*, 542 F.2d at 671.

**23.** *Accord, Anonymous v. Anonymous*, 558 F.2d 677, 679 (2d Cir. 1977).

**24.** The following excerpt from the deposition of Lowell Kratz refutes the defendants' contention that there is no substantive difference between eavesdropping by extension and by wiretap:

"Q. And did you record your conversations with Mr. Cadmus?
A. No, I don't call Mr. Cadmus from home.
Q. Why not?

Congress to have distinguished between eavesdropping by extension and by tapping.[25] We therefore find no merit in the defendants' argument that the extension phone exemption requires us to read into Title III an exception for wiretapping such as occurred in this case.

### C. Interspousal immunity.

██ In addition to their arguments based upon *Simpson*, the defendants claim that whatever the intent of Congress in enacting Title III, we cannot ignore the Pennsylvania law of interspousal immunity, 48 P.S. § 111, which prohibits one spouse from bringing suit against the other. However, we can ignore this statute and the defendants' argument. The short answer is that the cause of action in this case is provided by federal law and cannot be subverted by any state law or policy.

### D. Interstate commerce.

██ The defendants' next argument requires little discussion. They claim that Title III cannot constitutionally be applied to our case since the wiretap produced no effect upon interstate commerce, and therefore federal jurisdiction is lacking. While we reject the factual basis for the defendants' argument, whether or not there was an effect upon interstate commerce is irrelevant. Since the telephone is an instrumentality of interstate commerce, Congress has plenary power under the Constitution to regulate its use and abuse. *Weiss v. United States*, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939).[26]

### E. Due process.

██ The defendants also argue that it would violate due process to apply Title III to our case. Their inventive argument may be distilled to the following: since § 2511(1)(a) is a criminal statute, it must plainly and clearly give notice of the acts it prohibits. This notice is not plain and clear, say the defendants, because the phrase "any person", as used in the statute, does not mean "any person", and thus Lowell Kratz could not reasonably have known that his actions would be illegal! We decline to accept this unsupportable reading of Title III.

### F. Domestic relations.

██ Finally, Title III is not, as the defendants suggest, an intrusion by the federal government into the law of domestic

---

A. Well, because there was—there were four phones in the house. So she [Mildred Kratz] could listen to everything I was saying to Mr. Cadmus unless I called Mr. Cadmus in the morning to tell him that I wanted to see him that night. But other than that, I didn't convey any *informations* [sic] on the phones because I want to make sure nobody was listening.
Q. Well, you could have also picked up one of the extensions when your wife was using the telephone too, correct?
A. On occasions.
Q. Yes?
A. Yes, I could, but you could always tell when somebody picks up the receiver. You can usually tell."
Deposition of Lowell Kratz, at 40–41.

25. The court in *Jones* expressed "no opinion on the dictum in *Simpson* . . . that Title III does not reach a family member's interception of a telephone conversation by use of an extension telephone in the family home, other than to note that there is a vast difference between overhearing someone on an extension and in-

stalling an electronic listening device to monitor all incoming and outgoing telephone calls." 542 F.2d at 673 n. 24.

26. Even the *Simpson* court had "no doubts" that Congress has the power to prohibit the interception of telephone communications within the marital home. 490 F.2d at 805 n. 6. We think the defendants' error stems from their confusion between "wire" and "oral" communications; it was only as to the latter that the authors of Title III envisioned any constitutional difficulties, since many "oral" communications lack *any* interstate nexus. "Wire" communications, on the other hand, are defined in Title III as only those made through the use of "facilities . . . furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications". 18 U.S.C. § 2510(1). Since telephone communications are made through the use of such interstate facilities, their interception may be proscribed by Congress, even though they take place entirely intrastate.

relations, a subject traditionally left to the states. Title III regulates electronic eavesdropping, not marital relations. It proscribes one method of gathering evidence for use in, *inter alia*, domestic relations cases, but in no manner deals with the merits of such cases. The statute is unconcerned with questions of divorce, support, custody, property, etc., and though two opposing parties to the instant case are married, this case requires no resolution of such issues.

The institution of marriage is not such a "sacred cow" [27] that when Congress seeks to prohibit a "dirty business" [28] such as wiretapping it must abstain (or be deemed to have abstained) from proscribing this wrong when committed by one spouse against the other. The evils of electronic surveillance are not peculiar to the marital relationship, and there is no more reason to permit husbands and wives to perpetrate these evils upon each other with impunity than there is to permit them legally to commit any other crimes against each other.

Our case is a simple one; we deal here only with a fundamental and cherished human right, that of privacy. The enjoyment of that right has been seriously imperiled by modern technology, prompting Congress to enact Title III as a barrier to further encroachment upon such enjoyment. Since the right of privacy has been afforded federal statutory protection, there is no justification for a federal court, presented with

an "interspousal" Title III suit, to dismiss that suit by stating that it involves only a "domestic conflict".[29]

For all the above reasons, we reject the defendants' claim that Title III is inapplicable to the instant case, and we deny their motion to dismiss.

## III. THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY:

▮ As noted above, there is no genuine dispute as to the following material facts of this case: the defendant Lowell Kratz intentionally intercepted the telephone conversations of Mildred Kratz and Walter Roehrs, made notes of those conversations, disclosed the contents of the conversations to Fred Cadmus, and utilized the information learned through his eavesdropping to file a counter-suit for divorce. The defendant Fred Cadmus intentionally procured the interceptions through his conscious participation in Lowell's scheme: Cadmus sanctioned the interceptions, frequently discussed their contents with Lowell, advised Lowell not to remove the wiretap at the time when Lowell considered removing it, and used the information acquired from the wiretap as a basis for calling the wife of the Michigan man who had been phoning Mildred Kratz, hiring a private detective to follow the plaintiffs to London, and filing a counter-suit on Lowell's behalf for divorce.[30]

---

27. *Interspousal Surveillance*, at 196.

28. *Olmstead v. United States*, 277 U.S. 438, 470, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Holmes, J.).

29. For these reasons we must reject the holding of the Second Circuit in *Anonymous v. Anonymous*, 558 F.2d 677 (2d Cir. 1977).

30. We agree with Cadmus that the simple giving of legal advice by an attorney, without more, does not constitute "procurement". However, Cadmus admittedly did far more than render legal advice, and we must judge his actions in light of *Nye & Nissen v. United States*, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949), a case cited in the Senate Report in conjunction with "procurements" of interceptions under Title III. S.Rep.No.1097, [1968]

U.S.Code Cong. & Admin.News, at 2112, 2181. In that case, the Court discussed the meaning of 18 U.S.C. § 2, which defines as a "principal" any person who "aids, abets, counsels, commands, induces, or procures" the commission of a crime. The Court stated that an aider and abettor must " 'associate himself with the venture, . . . participate in it as in something that he wishes to bring about, . . . [and] seek by his action to make it succeed.' " 336 U.S. at 619, 69 S.Ct. at 770 (citation omitted).

Since Cadmus has raised no factual dispute as to whether or not his conduct satisfied these criteria, or whether his actions were taken with the intent that the interceptions occur, there is no question that he "consciously share[d] in any criminal act" within the meaning of *Nye & Nissen*, 336 U.S. at 620, 69 S.Ct. at 770, and

The plaintiffs allege that the above conduct renders the defendant Kratz guilty of intercepting their telephone conversations in violation of 18 U.S.C. § 2511(1)(a) and defendant Cadmus guilty of procuring the interceptions, also in violation of § 2511(1)(a). Additionally, the plaintiffs charge that defendant Kratz violated § 2511(1)(c) by unlawfully disclosing the contents of the intercepted communications, and that both defendants violated § 2511(1)(d) by unlawfully using the contents of those communications. As already noted, the plaintiffs have moved for summary judgment as to liability.

Preliminarily, we observe that all parties apparently have overlooked the fact that a defendant cannot be held liable under §§ 2511(1)(c) or (1)(d) unless he or she *knew* or *had reason to know* that the information used or disclosed was obtained from interceptions made in violation of § 2511(1). The defendants, of course, maintain that they acted in reliance upon *Simpson* and believed the interceptions were not in violation of § 2511(1). Although we have held that *Simpson* is erroneous, we think that if *Simpson* was the only federal case interpreting Title III which was available to a reasonably diligent attorney at the time Cadmus did his research, then the defendants indeed had no reason to know their conduct was unlawful.

However, the existence of the *Remington* decision, a case cited by the plaintiffs, raises a genuine and material factual issue as to whether or not the defendants had "reason to know" the interceptions were illegal. The opinion in *Remington* was filed on May 5, 1975, and reported soon after that date in the United States Law Week and the Criminal Law Reporter. Cadmus researched electronic surveillance law in early 1976; we may take judicial notice of the fact that

there is a delay between the filing of opinions and their appearance in advance sheets, digest pocket parts, Shepard's citations, etc. There is thus a material question of fact as to when a reasonably diligent lawyer researching the question raised by Lowell Kratz should have discovered the *Remington* opinion. There is also a question as to whether that opinion would have given a reasonable attorney a reason to know the interceptions contemplated by Lowell Kratz were illegal. Thus, whatever may be said about § 2511(1)(a), summary judgment cannot be granted with respect to the defendants' liability under §§ 2511(1)(c) and (1)(d).

The only ground actually advanced by the defendants in opposition to the plaintiffs' motion for summary judgment is their claim that an issue of fact exists as to their "willfulness" under 18 U.S.C. § 2511(1), which prohibits only *willful* interceptions of telephone communications, *willful* procurement of those interceptions, and *willful* disclosure and use of their contents. However, such an issue of fact exists only if we cannot say as a matter of law that the defendants' admittedly deliberate and intentional conduct was "willful" within the Title III meaning of that word.

Unfortunately, the defendants have presented no coherent definition of "willfully" as it is used in this statute. Initially, they suggest it means the "intentional violation of a known legal duty," [31] but then proceed to cite two federal cases construing Title III which hold that ignorance of the law is not a defense under that statute.[32]

It is not surprising that the defendants have been unable to come to terms with the meaning of "willfully", for that word as employed in criminal statutes to express the requisite mental state is an "ambiguous" [33]

---

that his conduct crossed the line between advice and participation.

**31.** The defendants have taken this definition from such cases as *United States v. Pomponio*, 429 U.S. 10, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976), dealing with violations of the tax laws.

**32.** *United States v. McIntyre*, 582 F.2d 1221 (9th Cir. 1978); *United States v. Schilleci*, 545 F.2d 519 (5th Cir. 1977).

**33.** W. LaFave and A. Scott, *Handbook on Criminal Law*, § 27 at 193 (1972).

one which has engendered much confusion and given rise to varying interpretations.[34]

The Supreme Court repeatedly has instructed that "[a]id in arriving at the meaning of the word 'willfully' may be afforded by the context in which it is used . . . ." *United States v. Murdock*, 290 U.S. 389, 395, 54 S.Ct. 223, 226, 78 L.Ed. 381 (1933).[35] However, the task of defining "willfully" in the context of Title III actually has been complicated by the Senate Report's reference to *Murdock* following the Report's observation that "[a] violation of each [subsection of § 2511(1)] must be willful to be criminal." S.Rep.No.1097, [1968] U.S.Code Cong. & Admin.News, at 2112, 2181.

*Murdock* concerned the prosecution of a taxpayer for refusing to provide the Internal Revenue Service with requested information concerning his tax liability. The defendant had based his refusal upon a good faith intention to exercise his Fifth Amendment privilege against compelled self-incrimination. In a pre-trial appeal, the Supreme Court had held the privilege unavailable in this particular case. The defendant was then convicted for violating the Revenue Acts of 1926 and 1928, which made criminal "willful" failures to supply required tax information. The Court of Appeals reversed the conviction, and at issue before the Supreme Court was the meaning of "willfully". The Court affirmed the judgment of the Court of Appeals, stating that by including "willfully" in the revenue statutes,

> "Congress did not intend that a person by reason of a bona fide misunderstanding as to his liability for the tax . . . should become a criminal by his mere

failure to measure up to the prescribed standard of conduct. And the requirement that the omission . . . must be willful, to be criminal, is persuasive that the same element is essential to the offense of failing to supply information." 290 U.S. at 396, 54 S.Ct. at 226. The Court therefore concluded that although the defendant's "refusal to answer was intentional and without legal justification, . . . the jury might nevertheless find that it was not prompted by *bad faith* or *evil intent*, which the statute makes an element of the offense." 290 U.S. at 397–98, 54 S.Ct. at 226 (emphasis added).

In the case of Title III, the authors of the Senate Report could not have cited *Murdock* out of a desire to implant in "willfully" some element of "bad faith" or "evil intent", for such a construction of the word would completely eviscerate the statute. Certainly one of the major purposes of Title III was to prohibit electronic surveillance by law enforcement officials acting without court orders authorizing such surveillance. Yet it cannot be denied that electronic surveillance, when undertaken by these officials during criminal investigations, is generally the product of the most laudable of motives and good intentions. But if such officials could assert their good faith enforcement of the criminal laws as a complete defense to Title III liability, then the statute, with its detailed provisions requiring law enforcement officials to obtain court orders in order to conduct electronic surveillance, and its provisions for judicial over-sight of such surveillance, would be meaningless.[36]

---

**34.** *See* discussion in Volume I, Working Papers of the National Commission on Reform of Federal Criminal Laws, at 120 and 148–51 (1970).

**35.** The Court "continue[s] to recognize that context is important in the quest for the word's meaning." *United States v. Bishop*, 412 U.S. 346, 356, 93 S.Ct. 2008, 2015, 36 L.Ed.2d 941 (1973).

**36.** Further evidence that "willfully" as used in Title III does not mean with "bad faith" is the § 2520 defense provided to those who rely in good faith upon a court order or legislative

authorization. This defense would be surplusage if "willfully" had such a meaning.

One court has attempted to apply *Murdock's* "bad purpose" language to Title III, with absurd results. In *United States v. McIntyre*, 582 F.2d 1221 (9th Cir. 1978), the Ninth Circuit stated that

> "The 'bad purpose' requirement implicit in Title III [from *Murdock*] indicates that Congress did not intend to subject police officers to criminal sanctions merely because they fail to comply with some of the statute's technical requirements. But Congress did not intend to immunize police officers from

Nor would it seem that the authors of the Senate Report cited *Murdock* because they desired "willfully" to mean the "intentional violation of the law", so that a "bona fide misunderstanding" of the law would be a defense under Title III. This again would emasculate the statute, for the reasons just explained.[37] In addition, we must recognize that in §§ 2511(1)(a) and (1)(b) Congress used *only* the word "willfully" to define the mental element of the crimes, but that in §§ 2511(1)(c) and (1)(d) Congress employed *both* "willfully" *and* the phrase "knowing or having reason to know that the information [disclosed or used] was obtained in violation of this subsection". This use in Title III of *both* words "willfully" and "knowing" indicates that they were intended to have separate and distinct meanings in the context of this statute.

The defendants have suggested that a jury could find that their conduct was not "willful" because they acted in reliance

Title III penalties simply because they are police officers. . . .
A police officer acts outside the scope of his duties and with 'bad purpose', and hence 'willfully' within the meaning of Title III, when he or she engages in electronic surveillance (1) without a court order, and (2) in the absence of the kind of emergency described in 18 U.S.C. § 2518(7)."
582 F.2d at 1225 (bracketed material added). But these paragraphs say nothing more than that a police officer acts with "bad purpose" under Title III when the officer fails to comply with the statute. Such circular reasoning does not advance the search for the meaning of "willfully".
Prof. Blakey suggested, citing *Murdock*, that "good faith mistakes under the statute will not be subject to criminal sanctions. This seems only just in light of the technical character of the Act." G. R. Blakey and J. A. Hancock, *A Proposed Electronic Surveillance Control Act*, 43 Notre Dame Lawyer 657, 666 n.19 (1968). However, the problem this interpretation creates is illustrated by the *McIntyre* holding, *supra*.

**37.** At least one federal court has rejected a good faith mistake of law as a defense under Title III. In *Campiti v. Walonis*, 453 F.Supp. 819 (D.Mass.1978), two Massachusetts prison inmates brought suit for damages under Title III against, among others, an investigator for the Department of Corrections Security Management Team, and the Superintendent and Deputy Superintendent of the institution in

upon *Simpson* and believed their actions to be legal. However, if a good faith mistake of law is sufficient under Title III to negate willfulness, then "willfully" as used in the statute must contain some element of "bad faith", "evil motive", or "knowledge of the law". But for the reasons already given, it is difficult to fit any of these definitions within the framework of the statute. Indeed, the one definition of "willfully" which gives effect to the language and purpose of Title III, and renders none of the statute surplusage, is "intentionally".[38] However, this definition may be precluded by the Senate Report's reference to *Murdock*.

■ We need not at this time, however, solve the mystery of the *Murdock* citation nor define "willfully" as it is used in Title III. *Whatever* that word means, summary judgment cannot now be granted, because a genuine issue of material fact exists as to the *reasonableness* of the defendants' reliance upon *Simpson*.[39] If their reliance

which the plaintiff Campiti was incarcerated. The plaintiffs alleged, and the court found, that the investigator had violated Title III by monitoring, through the prison switchboard, a telephone conversation between the plaintiffs. The court found the Superintendent and his Deputy guilty of unlawfully procuring the interception.
The court imposed liability upon all three of these defendants *despite* the fact that the interception was made in the course of an investigation and the defendants asserted that their actions were taken in "good faith". Also, the court found liability even though the defendants had acted in the (mistaken) belief that the interception was lawful.

**38.** Two state courts have so interpreted "willfully" as used in Title III, *Flournoy v. Wren*, 108 Ariz. 356, 498 P.2d 444 (1972) (en banc), *State v. McCartin*, 135 N.J.Super. 81, 342 A.2d 591 (1975), and it is the only definition which fits the holding in *Campiti*, discussed in footnote 37, *supra*. Also, "willfully" as used in the Federal Communications Act of 1934, 47 U.S.C. § 501 (a forerunner of Title III), was defined by at least one court to mean "intentionally". *United States v. Gris*, 247 F.2d 860 (2d Cir. 1957).

**39.** The resolution of this issue will depend upon whether or not *Remington* was available to a reasonably diligent lawyer in early 1976. *See* discussion, *supra*.

upon *Simpson* was *unreasonable* given the facts of this case, then we think the defendants' conduct would satisfy any of the possible definitions of "willfully". If their reliance was *reasonable,* then even if the defendants' conduct *was* "willful" under Title III, their reliance upon *Simpson* would entitle them to (although they have not so argued) the affirmative defense of reasonable reliance upon an official, but erroneous, statement of the law.

 In *criminal* cases [40], courts apply the ancient maxim that ignorance of the law, or a mistaken belief that one's conduct is lawful, is not a defense to liability,[41] unless the ignorance or mistake negates a required specific intent to violate the law. The historical foundation for this rule is that "everyone is presumed to know the law." [42] However, "even if there was once a time when the criminal law was so simple and limited in scope that such a presumption was justified, it is now an 'obvious fiction' and 'so far-fetched in modern conditions as to be quixotic.' " [43] Thus, the more modern and realistic justifications given for the rule are that a "mistake of law defense would encourage ignorance rather than a determination to know the law, and would interfere with the enforcement of the law, because the claim would be so easy to assert and hard to disprove." *United States v. Barker,* 178 U.S.App.D.C. 174, 198–99, 546 F.2d 940, 964–65 (D.C.Cir.1976) (Leventhal, J., dissenting).

 The harshness of the rule when applied in particular cases has been justified by statements from such revered scholars as Holmes, explaining that "justice to the individual is rightly outweighed by the larger interests on the other side of the scales." [44] However, neither of the two modern justifications for the rule is subverted by the recognition of an exception to the rule in cases in which the mistake of law is one generated by the defendant's reasonable reliance upon an official, but mistaken or later overruled, statement of the law. Therefore, such an exception has been recognized by many courts. *See, e. g., United States v. Barker,* 178 U.S.App.D.C. 174, 546 F.2d 940 (D.C.Cir.1976) (opinion of Merhige, J.) and cases cited therein, 178 U.S.App.D.C. at 190, 546 F.2d at 956.[45]

The Model Penal Code provides for this defense as follows:

"(3) A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when:

. . . . .

(b) he [the actor] acts in reasonable reliance upon an official statement of the law, afterward determined to be invalid or erroneous, contained in (i) a statute or other enactment; (ii) a judicial decision, opinion or judgment; (iii) an administrative order or grant of permission; or (iv) an official interpretation of the public officer or body charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense."

Model Penal Code, § 2.04.

The reliance defense actually serves the public policies which undergird the general rule in that it rewards those who seek out the requirements of the law and attempt to conform their conduct to those requirements. The defense should not in general provide difficulties of proof, particularly in cases such as ours in which the defendants have relied upon a published judicial opinion. Furthermore, the defense

"advances the policy of fostering obedience to the decisions of certain individuals and groups of individuals that society has put in positions of prominence in the

---

**40.** The instant case is of course a civil one; we will discuss the implications of this fact *infra.*

**41.** *Ignorantia legis neminem excusat.*

**42.** W. LaFave and A. Scott, *Handbook on Criminal Law,* § 47 at 363 (1972).

**43.** *Id.,* footnotes omitted.

**44.** Holmes, *The Common Law* 48 (1881).

**45.** *See,* in addition, discussion in Vol. 1, Working Papers of the National Commission on Reform of Federal Criminal Laws, 136–41 (1970).

governing structure—*i. e.*, courts, executive officials and legislative bodies."

*Barker, supra*, 178 U.S.App.D.C. at 190, 546 F.2d at 956 (opinion of Merhige, J.)

 It would be an act of "intolerable injustice"[46] to hold criminally liable a person who had engaged in certain conduct in reasonable[47] reliance upon a judicial opinion instructing that such conduct is legal. Indeed, the reliance defense is required by the constitutional guarantee of due process as illuminated by the Supreme Court in *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) and *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959).

*Raley* concerned four witnesses called before the Ohio Un-American Activities Commission who were informed (either directly or indirectly) by the Chairman of the Commission of their constitutional privilege against compelled self-incrimination. The four then asserted that privilege and were later convicted for contempt for refusing to answer the Commission's questions. The Ohio Supreme Court upheld the convictions on the ground that the witnesses "were presumed to know the law of Ohio—that an Ohio immunity statute deprived them of the protection of the privilege . . . ." 360 U.S. at 425, 79 S.Ct. at 1260.

The United States Supreme Court unanimously reversed three of the convictions, holding that they were obtained without due process of law.[48] The Court reasoned that since the Commission Chairman had told the witnesses that the Fifth Amendment privilege *was* available to them, but had *not* mentioned the existence of the Ohio immunity statute,[49] to sustain the convictions

"*would be to sanction the most indefensible sort of entrapment by the State* —convicting a citizen for exercising a privilege which the State clearly had told him was available to him. . . . A State may not issue commands to its citizens, under criminal sanctions, in language so vague and undefined as to afford no fair warning of what conduct might transgress them. . . . Inexplicably contradictory commands in statutes ordaining criminal penalties have, in the same fashion, judicially been denied the force of criminal sanctions. . . . Here there were more than commands simply vague or even contradictory. There was active misleading. . . . *The State Supreme Court dismissed the statements of the Commission as legally erroneous, but the fact remains that at the inquiry they were the voice of the State most presently speaking to the appellants.* We cannot hold that the Due Process Clause permits convictions to be obtained under such circumstances."

360 U.S. at 438–39, 79 S.Ct. at 1266. (emphasis added, citations omitted).

For similar reasons, the Court in *Cox* reversed the conviction of a civil rights leader for taking part in picketing "near" a state courthouse. The picketing had occurred across the street from the courthouse, a location at which the police had specifically told the demonstrators they were permitted to picket. The Court found the situation to be analogous to that in *Raley*, and held the conviction violative of due process.

Thus, in *Raley* and *Cox* the Supreme Court found the defense of reliance upon an

---

**46.** *Wilson v. Goodin*, 291 Ky. 144, 163 S.W.2d 309, 313 (1942).

**47.** The reasonableness of the reliance would of course be measured by an objective standard. For example, while reliance upon the opinion of a lower court is not, we believe, *per se* unreasonable, such reliance might be deemed unreasonable if an appeal were pending.

**48.** The conviction of the fourth witness was affirmed by an equally divided Court on the ground that he had been directed by the Commission to answer a particular question and his refusal to do so was therefore not based upon any representation by the Commission that the Fifth Amendment privilege was available as to that question.

**49.** There was no suggestion that the Commission had any intent to deceive the witnesses.

official but erroneous interpretation of the law to be *constitutionally* required. The Due Process Clause was invoked in these cases to prevent the fundamental unfairness of permitting individuals to be "entrapped" by the State, and to prohibit convictions when there is a lack of notice to the individuals of the requirements of the law. Implicit in these two cases is a holding that when individuals rely upon official but erroneous representations of the law they cannot be expected to know the law is otherwise, and thus can have no notice or fair warning of what the law actually requires or proscribes.

The same notice requirement of the Due Process Clause is implicated in situations in which individuals rely upon *judicial* interpretations of the law which are later modified or overruled. In *Marks* the defendants had been convicted of transporting, and conspiring to transport, obscene materials in interstate commerce. The conduct which gave rise to these charges covered a period through February 27, 1973; the trial began in October 1973. In the interim, on June 21, 1973, the Supreme Court handed down its opinion in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 announcing new standards for defining obscenity. At trial, the *Miller* standards were applied retroactively to the defendants. The defendants argued unsuccessfully in the lower courts that they were entitled to

> "jury instructions not under *Miller,* but under the more favorable formulation of *Memoirs v. Massachusetts,* 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1. . . . (1966) (plurality opinion). *Memoirs,* in their view, *authoritatively stated the law in effect prior to Miller, by which petitioners charted their course of conduct."*

430 U.S. at 190–91, 97 S.Ct. at 992 (footnote omitted, emphasis added).

The Supreme Court reversed the convictions, ruling that the defendants were indeed entitled to jury instructions based upon the judicial interpretation of the law in existence at the time they engaged in the allegedly illegal conduct. The Court reasoned that to apply *Miller* retroactively would violate the requirement of the Due Proces Clause "that persons have a right to fair warning of that conduct which will give rise to criminal penalties . . . ", 430 U.S. at 191, 97 S.Ct. at 993,[50] a right which the Court characterized as "fundamental to our concept of constitutional liberty." *Id.* Obviously, since *Memoirs* defined the law at the time the defendants acted, the only notice of the law's requirements of which the defendants could have been expected to be aware had to come from that opinion, and not one issued later.

The case now before us presents a situation analogous to that in *Raley, Cox* and *Marks*; as did the defendants in those cases, the defendants in our case relied upon an official but erroneous interpretation of the law stating that their contemplated conduct was legal. Were this a criminal prosecution, we have no doubt that the defendants would have the right to present the reliance defense, on the grounds of both "*Raley*—entrapment"[51] and "*Marks*—lack of notice".

■ However, this is a civil case, and thus not one in which the government, having "entrapped" the defendants through an erroneous interpretation of the law, is seeking to punish them for relying upon that interpretation. Rather, this is a case brought by private plaintiffs who have suffered damage at the hands of the defendants, and who played no role in the "entrap-

---

**50.** The Court in fact analogized the retroactive application of *Miller* to constitutionally forbidden ex post facto legislation. And LaFave and Scott have stated that "the better view is that it is a defense that the defendant acted in reasonable reliance upon a judicial decision, opinion or judgment later determined to be invalid or erroneous. . . . A contrary rule, whereby the subsequent holding would apply retroactively to the defendant's detriment, would be as unfair as ex post facto legislation." W. LaFave and A. Scott, *Handbook on Criminal Law,* § 47 at 367 (1972).

**51.** When the "entrapment" has been caused by a judicial opinion, the argument in favor of recognizing the reliance defense is even more compelling, since courts are the very entities charged with interpreting the law.

ment". It thus does not follow *a fortiori* that the reliance defense, although available in a particular criminal case, must be available as a defense in a *civil* case growing out of the same conduct giving rise to the criminal charge.

■ In the instant case, however, we believe the defense *must* be available. The actions engaged in by the defendants did not constitute a tort for which they could be sued, at least in federal court, absent Title III. Title III is foremost a criminal statute; although it does contain a provision creating a civil cause of action in favor of victims of unlawful electronic surveillance, that civil remedy is an inherent part of the criminal legislation. Indeed, no civil cause of action arises under Title III *unless* the criminal provisions of the statute have been violated. 18 U.S.C. § 2520. Thus, individuals who have no fair warning that their conduct is violative of Title III should no more be subject to its civil penalties than to its criminal ones.

In this case, the defendants relied upon a judicial interpretation of Title III which advised them that their contemplated conduct would not violate the statute. If their reliance upon *Simpson* was reasonable, they had no fair warning that the law was not as stated in that opinion. Although *Simpson* was erroneous, the defendants could not have been expected to recognize its errors, or to know more law than the Fifth Circuit Court of Appeals.[52] Nor could the defendants have predicted that we would reject that court's reading of Title III. Lawyers are not soothsayers, and possess no crystal balls in which to foresee changes in judicial interpretations of the law. To hold these defendants to our reading of Title III would constitute a species of retroactive application of the law. Assuming that the defendants' reliance upon *Simpson* was reasonable, the result would be to deprive them of their property when they in fact had no fair warning of what conduct the law proscribed or that Title III would be applied to them.

Also important in this case is the fact that *Simpson* held not merely that "interspousal wiretapping" did not violate Title III, but specifically that it *did not* give rise to *civil* liability under the statute. Thus, the *Raley* entrapment problem arises in the instant *civil* case. *Simpson* was the voice of the federal government speaking to the defendants and advising them that their contemplated conduct would not render them civilly liable under Title III. It would be constitutionally immoral for the federal government, having thus "entrapped" the defendants, to allow itself to be used as a vehicle for wringing from them civil damages.

As recognized long ago, "The knowne certaintie of the law is the safetie of all."[53] In our legal system,

> "[t]he behavior of the people is circumscribed by the Constitution, legislative acts, and judicial opinions. They have the right to rely on judicial interpretation and application as to each. While the law is and should be ever in progression towards perfection its application should be as immutable as the law of gravitation until a change has been effected therein either by constitutional amendment, by legislation or by judicial interpretation. A change being thus wrought, then a change in application is permissible."

*State v. Stout,* 90 Okl.Cr. 35, 210 P.2d 199, 203 (1949). A contrary rule would be intolerable in a society which prides itself upon fairness in the application of its laws. We cannot as a matter of fundamental justice say that individuals act at their peril when they reasonably rely upon judicial decisions. If the law required otherwise, we would do better to replace our courts with casinos and dispense judgments by a spin of the roulette wheel.

---

**52.** *Cf. United States v. Mancuso,* 139 F.2d 90, 92 (3d Cir. 1943) ("While it is true that men are, in general, held responsible for violations of the law, whether they know it or not, we do not think the layman participating in a law suit is required to know more law than the judge. If the litigant does something, or fails to do

something, while under the protection of a court order he should not, therefore, be subject to criminal penalties for that act or omission.").

**53.** Coke, *Institutes* 395 (12th ed. 1738) (Epilogue to Pt. 1, Bk. 3).

For all the above reasons we hold that the defense of reasonable reliance upon a judicial interpretation of Title III must be available to the defendants in this case.[54]

As already noted, a genuine issue of fact exists as to the reasonableness of the defendants' reliance upon *Simpson*. Because that fact is one material to the determination of the "willfulness" of the defendants' conduct and to the proof of the reliance defense, summary judgment cannot be granted as to liability. We therefore deny the plaintiffs' motion.

---

**54.** We note that in Title III Congress has recognized an analogous defense to criminal and civil liability based upon "[a] good faith reliance on a court order or legislative authorization . . . ." 18 U.S.C. § 2520 (as amended 1970). This defense was inserted in the statute to placate telephone company officials worried that their employees might be subject to liability when assisting the police in electronic surveillance. *See* discussion of legislative history in *Jacobson v. Rose*, 592 F.2d 515, 522–23 (9th Cir. 1978), *cert. denied*, —— U.S. ——, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979).

The fact that Congress has not explicitly recognized a defense based upon reliance on a court *opinion* does not preclude *our* recognition of such a defense, particularly as its availability is required by the Due Process Clause. For the same reason, we have not impermissibly "read into" the statute that which is not there.