**UNITED STATES of America,**

v.

**Richard Craig SMITH.**

**Crim. No. 84–00092–A.**

United States District Court, E.D. of Virginia, Alexandria Division.

Aug. 1, 1984.

Joseph Aronica, Kenneth E. Melson, Asst. U.S. Attys., Roberta L. Elkins, Trial Attorney Dept. of Justice, Alexandria, Va., for U.S.

William B. Cummings, Alexandria, Va., A. Brent Carruth, Van Nuys, Cal., for defendant.

## MEMORANDUM OPINION & ORDER

RICHARD L. WILLIAMS, District Judge.

This matter comes before the Court pursuant to § 6(a) of the Classified Information Procedures Act (CIPA) for a determination "concerning the use, relevance, or admissibility of classified information" sought to be used at trial. 18 U.S.C.App. § 6(a). For reasons developed below, the Court holds as follows:

(1) Defendant Smith's version of events, if believed, constitutes a legally valid defense to the charges against him;

(2) Federal rules of evidence, CIPA, and the Federal Constitution require that Smith be permitted both to testify to his version of the facts and to present other competent evidence, including classified information, in support of his defense;

(3) In accordance with CIPA and federal rules of evidence, Smith may introduce the specific items of classified information enumerated in Parts III, IV & V of this opinion.

### I. THE INDICTMENT AND THE DEFENSE

The government alleges that Richard Craig Smith unlawfully disclosed classified information to an agent of the Soviet Union. According to the indictment, Smith met with Victor I. Okunev, a Soviet agent, at the Soviet Commercial Compound in Tokyo, Japan twice in November of 1982 and once in February of 1983. Smith, who was employed by the Army Intelligence Security Command (INSCOM) between 1973 and 1980, allegedly gave Okunev classified details concerning five INSCOM double agent operations in exchange for $11,000. All in all, the indictment charges Smith with five counts of violating the Espionage Act. 18 U.S.C. §§ 793(d); 794(a) & (c).

Smith's version of the facts differs dramatically from that set forth in the indictment. He claims that in disclosing secret information to Okunev he believed he was acting at the behest of the CIA. According to Smith, he was contacted in Japan by two men, Ken White and Danny Ishida, who held themselves out as CIA agents. Although he did not ask to see identification papers, he claims that their familiarity with the details of secret INSCOM operations convinced him that they were in fact CIA agents. White and Ishida, Smith asserts, sought to enlist him in a double agent project directed at the Soviets in Japan. They assertedly told him that, in order to gain the confidence of the Soviets, he had authority to disclose the details of eight INSCOM double agent operations, including all of those mentioned in the indictment. The information, they allegedly told him, was of no value to the Soviets because the pertinent operations had been discontinued.

## II. THE ADMISSIBILITY OF CLASSIFIED INFORMATION

The government, relying on essentially two arguments, takes the extreme position that Smith may not present any classified information in support of his factual defense. It first insists that Smith's factual

allegations, even if believed, are insufficient, as a matter of law, to exculpate him. Its second argument goes to the believability, as distinguished from the legal sufficiency, of Smith's factual assertions. The government, in essence, urges the Court to exclude all classified information based on a judicial determination that Smith's version of events is a "total fabrication." The Court rejects both arguments.

### A. Legal Sufficiency of Smith's Alleged Facts

■ The Court undoubtedly has authority to exclude evidence offered by the defense which, *if believed*, fails to establish a legally cognizable defense. *U.S. v. Bailey*, 444 U.S. 394, 414–16 & n. 11, 100 S.Ct. 624, 636–37 & n. 11, 62 L.Ed.2d 575 (1980); *U.S. v. Bifield*, 702 F.2d 342 (2d Cir.1983).[1] The government argues that the facts Smith alleges, if credited by a jury, do not establish a legally valid defense under the Espionage Act. It is not sufficient, the government contends, that Smith *believed* that (1) White and Ishida were CIA agents and, (2) acting on behalf of the CIA, they authorized him to disclose the details of INSCOM operations to the Soviets. To establish a valid defense, the argument runs, Smith must be prepared to prove that White and Ishida *actually* were CIA agents who *actually* had authority to permit Smith to

---

**1.** Both *Bailey* and *Bifield* stand for the proposition that the court, in determining whether evidence is sufficient to meet all of the legal requirements of a defense, must accept the truth of the proffered evidence. In those cases the defendant was charged with escaping from federal custody, a violation of 18 U.S.C. § 751. The defendant asserted a hybrid duress/necessity defense, claiming that prison conditions were so egregious that he was forced to flee. In *Bailey* the Supreme Court held that in the context of § 751 the defense of duress/necessity requires "a bona fide effort to surrender or return to custody as soon as the claimed duress or necessity [loses] its coercive force." 444 U.S. at 415, 100 S.Ct. at 637. Because the defense adduced no evidence that could satisfy this legal element of the defense, the Court in *Bailey* held that the trial court properly refused to instruct the jury on the defense. Although the dissent chided the Court for "deciding factual questions that should be presented to the jury", 444 U.S. 419, 428, 100 S.Ct. 639, 643 (Blackmun & Brennan, JJ., dissenting), the Court disagreed:

> [W]e remain satisfied that, *even if credited by the jury,* the testimony set forth at length in [the dissenting] opinion could not support a finding that the [accused had made a bona fide effort to surrender].

444 U.S. at 415–16 n. 11, 100 S.Ct. at 637 n. 11.

The defendant in *Bifield* offered to testify that he intended to return to the prison. In affirming the trial court's refusal to permit evidence of the asserted duress/necessity defense to go to the jury, the Second Circuit held that the proffered testimony was insufficient to satisfy the legal requirement of a bona fide effort to surrender. The court, however, did not base its decision on its own views concerning the credibility of the testimony. Rather, it reasoned the defendant's intention, no matter "how convincingly expressed", was insufficient because the law requires proof of objective acts showing a bona fide attempt to return to custody. 702 F.2d at 346.

disclose INSCOM information. The Court disagrees.

Smith is charged with violating two sections of the Espionage Act. 18 U.S.C. §§ 793(d), 794(a) & (c). Both sections, which define unlawful disclosure of information relating to the national defense, contain express state-of-mind requirements. Section 794 prohibits a person from transmitting such information to an agent of a foreign government *"with intent or reason to believe* that it is to be used to the injury of the United States or the advantage of a foreign nation ...."* (emphasis added). Section 793(d) similarly proscribes disclosure of national defense information by a person who "has *reason to believe"* such information could be used to injure this country or aid a foreign government. (emphasis added). As the language of these provisions and the cases interpreting them conclusively demonstrate, the government must prove beyond a reasonable doubt that the accused had the requisite intent to injure this country or aid a foreign government. In the words of the Supreme Court:

**2.** An unreasonable mistake is arguably insufficient to constitute a defense to the Act. Where a person makes an unreasonable mistake, he arguably had "reason to believe" that his actions would injure this country. For purposes of deciding whether Smith is entitled to present evidence of his version of events to the jury, however, the Court need not now decide whether Smith's mistake must have been reasonable to constitute a valid defense. Assuming that only a reasonable mistake will suffice, the Court cannot exclude evidence of his alleged defense because his mistake was, as a matter of law, unreasonable. In light of Smith's testimony that White and Ishida satisfied his inquiries as to secret details of INSCOM operations, a rational juror could conclude that he reasonably believed them to be CIA agents.

**3.** The government seems to suggest that it can establish Smith's guilt simply by showing that Smith knowingly released classified information:

He knew that the information that he was to disclose was classified information and he intended to disclose the information with which he is charged. The conversation he had with White and Ishida merely goes to his motivation in doing so and does not vitiate the intent with which he dealt with Okunev.

[The statute] requires those prosecuted to have acted in bad faith. The sanctions apply only when scienter is established. *Gorin v. U.S.,* 312 U.S. 19, 28, 61 S.Ct. 429, 434, 85 L.Ed. 488 (1941). *See also U.S. v. Rosenberg,* 195 F.2d 583, 592 (2d Cir.1952); *U.S. v. Love,* 472 F.2d 490, 508 (D.N.J. 1978).

■ The government reads the state-of-mind requirements out of the statute, seeking, in effect, to transform § 794 and § 793 into strict liability offenses. Smith obviously did not intend to, or have reason to believe that he would, injure this country if he thought that in disclosing INSCOM information he was furthering a CIA-authorized double agent program. In the government's view, however, Smith's state-of-mind—whether he *believed,* reasonably or otherwise,[2] that the CIA agents had authorized disclosure—is irrelevant. Even though Smith might have reasonably believed that White and Ishida were CIA agents, the government interprets the statute to require that Smith *actually* have had authority to release INSCOM information to the Soviets.[3] This view of the stat-

Government's Supplemental Submission on CIPA Matters, at 13. The government's position seems to be that once it has shown that the defendant knowingly disclosed classified information, the burden shifts to the defendant to show, by way of affirmative defense, that disclosure was in fact authorized. This view of the statute ignores the obvious fact that members of the American intelligence community necessarily disclose classified information as part of double agent operations. Yet, if the government's position is accepted, double agents who make such disclosures are in violation of the Espionage Act—they have knowingly disclosed classified information. Congress did not intend this anomolous result. This type of disclosure, the type of disclosure in which Smith allegedly believed himself to be engaged, does not violate the Espionage Act.

The government cannot establish that a person intended to, or had reason to know he would, injure this country merely by showing that the person knowingly released classified information. The language of the Espionage Act does not proscribe release of classified information per se. It is not the disclosure of classified information that the statute condemns but the intent to injure this country. Consonant with the express requirements of the Act, the government must prove that the defendant dis-

ute misdirects attention from the subjective issue of Smith's intent to the objective issue of whether release of INSCOM information actually, or reasonably might have, harmed this country. By ignoring the crucial issue of Smith's state-of-mind, the government treats the applicable provisions of the Espionage Act as strict liability offenses. If the government's interpretation were correct, a person who, based on facts then known to him, mistakenly but reasonably believed that a CIA official had authorized disclosure would nevertheless be in violation of the Act, even though he fully intended to *help* this country. This is not the law. The Congress that enacted § 794 provided that violations may be punished by death.[4] The Court finds it difficult to believe that the government can be serious in its contention that Congress intended to provide capital punishment for what it interprets as a strict liability offense. The government's interpretation of § 794(a) & (c) thus defies express statutory language, Supreme Court precedent, and plain common-sense.

The government, characterizing Smith's alleged belief that CIA agents had authorized him to reveal secret information as a mistake of law,[5] couches its argument in the vernacular of the mistake of law doctrine. It is true that, as a general matter, a mistake of law is no defense. Nevertheless, this case is quite unlike the classic mistake of law situation where the accused claims innocence because he was ignorant of the underlying offense. It is no defense to murder, for example, to say that the accused did not know that murder is a crime. Nor is it a defense to a charge of espionage to claim that the accused was unaware of the Espionage Act. In both of these examples, the accused, while ignorant of the charged offenses, had an intent that the law proscribes. *See U.S. v. International Minerals & Chemical Corp.,* 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971) (ignorance of the charged offense is no defense); *U.S. v. Rosenfeld,* 469 F.2d 598 (2d Cir.1972) (same). In contrast, Smith's alleged mistake, whether labeled a mistake of law or of fact, negates the very intent that the Espionage Act requires. To

---

closed the information *with the required intent to injure this country.* A person such as a double agent who releases classified information in the belief that disclosure is authorized lacks the required intent to injure this country. Because the person lacks the intent *ab initio,* he does not, as the government suggests, bear the burden of pleading or proving actual authorization as an affirmative defense. A persuasion-shifting presumption that knowing disclosure of classified information carries with it an implied intent to injure this country would unconstitutionally shift the burden of prove on the issue of intent. *See Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

The government's argument that the defendant has no defense to the statute unless his release of classified information was, in fact, authorized is treated and rejected in the text.

**4.** The Act's death penalty provision has been struck down as unconstitutional because it lacks the discretion-channeling standards needed to safeguard against the arbitrariness condemned in *Furman v. Georgia. U.S. v. Harper,* 729 F.2d 1216 (9th Cir.1984). This provision is nevertheless relevant in construing the enacting Congress' intent.

**5.** The government's entire argument is based on the assumption that White and Ishida were not actually CIA agents. The validity of this as-

sumption, however, is an issue of fact that is legitimately in dispute. That the CIA has no records of persons using the names White or Ishida does not, as the government seemingly assumes, conclusively establish that they do not exist or were not CIA agents. As proffered to the Court, Smith's testimony provides circumstantial evidence from which a rational juror could conclude that White and Ishida actually were CIA agents. Because Smith's account of the facts is not incredible as a matter of law, *see* Part I., § B, *infra,* the jury is entitled to accept it. The Court accordingly cannot rule as a matter of law that White and Ishida did not exist or that they were not in fact CIA agents.

The Court adopts this conclusion as an independent basis for its holding that the facts alleged by Smith, if believed, constitute a valid defense. Assuming *arguendo* that the government is correct in interpreting the Espionage Act to require that Smith establish that White and Ishida actually were CIA agents, Smith's evidence is not, as the government contends, insufficient as a matter of law. Based on Smith's testimony, a rational juror could conclude that White and Ishida actually were CIA agents who actually authorized him to reveal secret information.

reiterate, Smith did not intend to, or have reason to believe he would, injure this country if, based on White and Ishida's putative status as CIA agents, he believed that CIA agents had authorized disclosure of the INSCOM information. If his version of the facts is accepted, he, in fact, intended to *help* this country by acting as a double agent. No amount of legal legerdemain can obscure this basic conclusion.[6] It is settled law that a mistake of law is a defense where it negates the intent required by the charged offense. *See U.S. v. Behenna*, 552 F.2d 573, 575–77 (4th Cir. 1977); *U.S. v. Painter*, 314 F.2d 939 (4th Cir.1963); *U.S. v. Fierros*, 692 F.2d 1291 (9th Cir.1982); *U.S. v. Currier*, 621 F.2d 7, 9 n. 1 (1st Cir.1980); *U.S. v. Petersen*, 513 F.2d 1133, 1135 (9th Cir.1975); *U.S. v. Squires*, 440 F.2d 859, 862–65 (2d Cir.1971); *Kratz v. Kratz*, 477 F.Supp. 463, 480 (E.D. Pa.1979); Model Penal Code § 2.04(1)(a) (Tent. Draft No. 4 1955). Because Smith's alleged mistake negates the intent required by the Espionage Act, it constitutes a valid defense. Assuming *arguendo* that it is properly labeled a "mistake of law",[7] it must be treated as mistakes of fact have traditionally been treated.[8] To hold other-

---

**6.** The following syllogism accurately captures the government's position:

(1) White and Ishida, if they existed, were not CIA agents, *see* note 5 *supra*, and thus were not empowered to authorize disclosure of classified information;

(2) Smith was therefore mistaken as to White and Ishida's "legal authority";

(3) A mistake as to a person's legal authority is a mistake of law;

(4) Except in circumstances not present here, a mistake of law is no defense.

This line of reasoning is misleading.

First, the mechanistic labeling approach implicit in steps 2 through 4 confuses rather than clarifies the ultimate issue at stake. Labels aside, the issue here boils down to one of statutory construction: Does Smith's alleged mistake negate the state-of-mind requirements spelled out in the charged offense? The specific rules that courts have devised in dealing with mistakes of law and of fact all spring from the more fundamental principle of statutory construction that a mistake that negates the intent required by the offense constitutes a valid defense. *U.S. v. Petersen*, 513 F.2d 1133, 1135 (9th Cir.1975); *U.S. v. Squires*, 440 F.2d 859, 862–65 (2d Cir.1971); Model Penal Code § 2.04(1)(a) & Accompanying Comments (Tent. Draft No. 4 1955).

*See U.S. v. Byrd*, 352 F.2d 570 (2d Cir.1965) (one is ordinarily not guilty of a crime unless he is aware of the existence of all of those facts which made his conduct criminal); *U.S. v. Jonas Bros.*, 368 F.Supp. 783 (D.Alaska 1974) (mistake of law is a defense where offense establishes knowledge of law as an element of the crime); *U.S. v. Currier*, 621 F.2d 7, 9 n. 1 (1st Cir.1980) (mistake as to legal status defined independently of charged offense is a defense). The question here, then, is whether Smith's mistake, if he made one, negates the required intent to injure this country. It does not answer this question to discuss whether a mistake as to a person's legal authority is labeled a mistake of law and treated as a valid defense in the context of other offenses. As with other types of mistakes, the proper treatment of such a mistake undoubtedly depends on the nature of the intent required by the charged offense. *See U.S. v. Miller*, 658 F.2d 235, 237 (4th Cir.1981); *U.S. v. Behenna*, 552 F.2d 573, 575–77 (4th Cir.1977); *U.S. v. Fierros*, 692 F.2d 1291 (9th Cir.1982).

Second, the government's characterization of Smith's alleged mistake as a mistake as to White and Ishida's legal authority misstates the nature of the mistake. As explained in the text, *see* text accompanying nn. 11 & 12 *infra*, Smith was not mistaken as to the law, that is, the legal definition of a CIA agent or the legal authority of a CIA agent to authorize disclosure of secret information. His mistake, if he made one, had to do with the facts concerning White and Ishida's true activities, that is, whether they were, as they allegedly told Smith, involved in covert activities on behalf of the CIA. Thus, Smith's belief that White and Ishida had legal authority to act might have been mistaken, *see* note 5 *supra*, but the mistake rested on an erroneous perception of the facts, not the law. *See* Note, *Reliance on Apparent Authority as a Defense to Criminal Prosecution*, 77 Colum.L.Rev. 775, 789–90 (1977).

**7.** For reasons expressed in the text, *see* text accompanying nn. 11 & 12, the Court holds that if Smith made a mistake it was one of fact, not law. *See* note 6 *supra*.

**8.** Assuming that Smith's allegedly mistaken beliefs as to White and Ishida's status as CIA agents or as to the authority of CIA agents to permit disclosure of classified information can be characterized as a mistake of law, the alleged mistakes fall within a recognized exception to the mistake of law doctrine. This exception, discussed more fully in note 10 *infra*, holds that a mistake of law is a defense where the mistake concerns a legal concept defined independently of the charged offense. *See* note 10. Legal authority to act on behalf of the CIA, like the legal concept of residence in *U.S. v. Behenna*, 552 F.2d 573, 575–77 (4th Cir.1977), is defined independently of the charged offense.

wise would be to interpret the applicable provisions of the Espionage Act as creating strict liability offenses, an interpretation that is utterly impossible to reconcile with the Act's express state-of-mind requirements. The mistake of law doctrine, a judicially created set of rules, must be flexibly interpreted in light of, and yield to, express statutory language and intent.

In support of its use of the mistake of law doctrine, the government cites the various opinions in *U.S. v. Barker*, 546 F.2d 940 (D.C.Cir.1976). There the defendants had burglarized a psychiatrist's office in search of psychiatric records concerning a patient who was suspected of leaking classified government documents to the press. They were charged with conspiring to violate the federal rights of another, an offense that requires an intent to violate another person's "clearly established" federal rights. *U.S. v. Ehrlichman*, 546 F.2d 910 (D.C.Cir.1976). The defense was based on the allegation that the defendants believed that a highly placed White House official had authorized their actions. Treating this allegation as raising a mistake of law defense, a divided panel reversed defendants' convictions. Judges Wilkey and Merhige, writing separately, concluded that there is a limited exception to the mistake of law doctrine where the accused reasonably relies on an official's erroneous representation of the legal authority of his office. The government argues that this limited exception is inapplicable here because, however defined, it depends on an initial showing that a governmental official was actually involved.

■ The government's reliance on *Barker* is misplaced. In *Barker* the defendants' mistake was clearly one of law. The de-

fense was based on an erroneous legal conclusion, implicitly communicated to the defendants by persons who were unquestionably White House officials, that the President, or his highest advisers, could legitimately authorize national security burglaries. In contrast, Smith did not base his actions on a mistaken perception of the law. First, the government does not contend that Smith was confused or mistaken as to the legal conditions under which a person may be deemed to be a CIA agent. If Smith was mistaken,[9] his mistakes were factual in nature. Based on White and Ishida's extensive knowledge of secret INSCOM information, he allegedly believed their factual representations that they were directing covert operations, including his own, on behalf of the CIA. Persons who direct covert CIA operations undoubtedly satisfy the legal definition of a CIA agent. Second, the government does not maintain that Smith misconstrued the legal authority of a CIA agent, acting on behalf of the CIA, to permit disclosure of classified information. It does not suggest that CIA agents may not authorize disclosure of classified information. *Cf. U.S. v. Kelly*, 718 F.2d 661, 665 (4th Cir.1983) (defendant's "alleged state of mind ... was not a mistake of fact as to Ray's status [as an informant], but resulted from a misconception of the legal prerogatives attached to that status"). Such a suggestion, if accepted, would cripple double agent programs which, by necessity, involve disclosure of information that is not in the public domain. In short, Smith's alleged belief that he had been authorized by the CIA to disclose INSCOM information to the Soviets was not based on a mistaken view of the legal definition of a CIA agent or of the legal authority of a CIA agent.[10] His be-

9. *See* note 5 *supra.*

10. It seems beyond cavil that the CIA, in carrying out double agent programs, has authority to permit disclosure of classified information. But if, for reasons unknown to the Court, the CIA has no such authority, Smith could not be fairly charged with knowledge of the jurisdictional parameters of various intelligence agencies for purposes of the Espionage Act.

One might argue, however, that Smith made a mistake of law in assuming that CIA agents at White and Ishida's level had authority to permit disclosure of classified information. Although it may well be that agents at this level have no authority themselves to permit disclosure of classified information, they undoubtedly have authority to communicate decisions made by those who in the CIA hierarchy who have authority. A rational juror could conclude that

lief was instead predicated on a possibly mistaken view of the facts concerning White and Ishida's true activities.[11]

This, then, is not a case like *Barker* where the defendant allegedly acted in reliance on an official's erroneous statement of the law. Smith did not, for instance, act at the direction of a local police officer who told Smith that, as a local police officer, he had authority to permit release of classified information to the Soviets. Smith acted in reliance on an implied representation, made by persons he believed to be CIA agents, that the CIA has legal authority to permit release of classified information. The government has not, and could not, seriously suggest that, like the governmental offi-

cials in *Barker*, White and Ishida misrepresented the legal authority of the office the defendant believed them to hold. Rather than acting on a mistaken view of the legal authority of governmental officials, Smith, if believed, acted in reliance on facts that led him to believe that he was dealing with government agents. *Barker* does not address this situation. There all were agreed that the governmental officials involved were, in fact, the governmental officials they purported to be. Nothing in *Barker* suggests that a defendant has no defense where, although mistaken as to the person's actual status, he has a proper conception of the legal authority possessed by an official having the purported status.[12] This

Smith relied on White and Ishida's authority to communicate top-level decisions concerning disclosure.

Even if White and Ishida erroneously represented, and Smith mistakenly assumed, that they themselves had authority to permit disclosure, this mistake would not defeat his defense. A mistake as to who in the CIA has authority to permit release of classified information would not fall within the general rule that a mistake of law is no defense. Although ignorance of the law is generally no defense, Smith cannot be fairly charged with knowledge of the CIA's internal structure of authority since this structure is no doubt a well kept secret.

In addition, this type of mistake would fall within a recognized exception to the general rule that a mistake of law doctrine. A mistake of law constitutes a valid defense where the mistake does not flow from the defendant's ignorance of the charged offense but rather flows from his ignorance of "an independently determined legal status or condition that is one of the operative facts of the crime." *U.S. v. Fierros*, 692 F.2d 1291, 1294 (9th Cir.1982). In *U.S. v. Behenna*, 552 F.2d 573, 575–77 (4th Cir.1977), for instance, the defendant was charged with knowingly making a false statement on a firearm registration form. On the form he indicated South Carolina as his state of residence even though this was not his true state of residence as defined by the law. Treating the defendant's mistake as a mistake of law, the Fourth Circuit held that an honest mistake as to his "residence", a legal concept defined independently of the charged offense, constituted a valid defense because it negated the scienter specifically charged in the indictment. *See also U.S. v. Petersen*, 513 F.2d 1133, 1135 (9th Cir.1975); *U.S. v. Currier*, 621 F.2d 7, 9 n. 1 (1st Cir.1980). The rationale for this exception is that a mistake as to an independently defined legal status is, in reality, a mistake of fact. *U.S. v. Fierros*, 692 F.2d at 1294.

**11.** In analyzing the issue of a defendant's reliance on the apparent authority of a governmental official, one commentator has distinguished between two components of apparent authority: the "status" component and the "authorization" component. The status component refers to the defendant's belief, based on the facts then known to him, that the person on whose authority he relies is a government official of a particular type. The authorization component refers to the defendant's belief as to the authority possessed by that type of official. Note, *supra* note 6, at 789.

Mistakes as to the status element are generally mistakes of fact; they rarely involve a misconception concerning the legal definition of the governmental position. A mistake of law, if one is made, will typically involve the authorization element. In *Barker*, for instance, the defendants, based on the implicit representation of White House officials, mistakenly believed that the President has authority to order warrantless domestic break-ins in the interest of national security.

In contrast, this case does not involve a mistake as to the authorization element. If Smith made a mistake, it was only a factual mistake as to White and Ishida's status.

**12.** Judge Merhige, addressing the case where the defendant relies on an erroneous representation as to an official's authority, did suggest that a defense is unavailable if the person making the representation is not in fact a public official. According to Judge Merhige, the reliance on an official statement of the law defense does not apply where "an individual places his or her reliance, through reasonable, in a stranger to public office erroneously believing him to be a public official." *Barker*, 546 F.2d at 956. The Court declines to apply this rule here. First, the rule applies only where the defendant asserts the "mistaken official state-

suggestion would be flatly contrary to the general principle, recognized in *Barker,* that a mistake of law constitutes a defense where it negates the intent required by the charged offense. In this case there can be no question that Smith's acts would not have been criminal if the facts were as he says he believed them to be, that is, if White and Ishida actually were engaged in the activities they explained to him. The mistake of fact defense is available in this situation. *U.S. v. Barker,* 546 F.2d at 946 & n. 15 (Wilkey, J.); 546 F.2d at 961 & nn. 12 & 13 (Leventhal, J.); Note, *Reliance on Apparent Authority as a Defense to Criminal Prosecution,* 77 Colum.L.Rev. 775, 790 & n. 78 (1977). If believed, Smith, due to his view of the facts concerning White and Ishida's activities, lacked the state-of-mind required to establish a violation of the Espionage Act.

 In light of the Espionage Act's express state-of-mind requirements, the Court holds that Smith's factual allegations, if believed, establish a legally valid defense to the charges against him. If he truly believed that CIA agents had authorized the disclosure of INSCOM information he lacked the intent, required by the Espionage Act, to injure this country or to aid a foreign power.[13]

### B. *Believability of Smith's alleged facts*

 The government advances a second argument in favor of its position that Smith may not introduce any classified information at trial. Whereas its first argument addresses the *legal sufficiency* of Smith's account of the facts, its second argument concerns its *believability.* This is an important distinction. Unlike the situation where evidence, if believed, fails to establish a legally cognizable defense, a court's authority to exclude evidence of a defense on the ground that it lacks believability is extremely limited, if it exists at all.

Smith's defense, the government submits, is a patent fabrication. It points out that the FBI interviewed Smith approximately 23 times over the course of nearly 8 months, sometimes using a polygraph in an attempt to elicit the truth. At all times he maintained that he had acted alone in contacting the Soviets, never mentioning either the names of White and Ishida or his supposed connection with the CIA. The first mention of his so-called CIA defense came after his arrest and indictment. The government insists that the only reasonable inference to be drawn from his failure to mention his CIA defense during the FBI interviews is that he concocted his defense in a rather blatant attempt at "graymail." Because this tactic undermines the clear purpose of CIPA, the government asks the Court to rule all classified information inadmissible.

The Court declines to make the requested ruling. Although the government be-

---

ment of the law" defense. In other words, the rule comes into play only where the defendant has made a mistake both as to status component and the authorization component described *supra. See* note 11. In this case the defendant made a mistake only as to the status component. Second, the Court rejects Judge Merhige's statement of the law as inconsistent with the mistake of fact doctrine. Mistakes as to a person's official status typically involve mistakes of fact. *See* note 11. There is no reason to abandon the traditional treatment of mistakes of fact in this context, even where coupled with a mistake of law as to the putative official's legal authority. Indeed, to do so would lead to harsh and arbitrary results.

**13.** The government argues that Smith's conversations with White and Ishida are inadmissible hearsay:

[S]ince his defense is one of mistake of law and not fact, the contents of the defendant's conversations with White and Ishida are inadmissible hearsay since those conversations do not fall within Federal Rules of Evidence 803(3) [ (exception for then existing mental, emotional, or physical condition) ].

Government's Supplemental Submission on CIPA Matters, at 11. This argument is without merit. The conversations are not within the definition of hearsay. They are offered to prove Smith's state-of-mind rather than the truth of the matter therein asserted. Fed.R.Evid. 801(c). The admissibility of the conversations thus does not turn on the applicability of the hearsay exceptions.

lieves that such a ruling would further the purposes of CIPA, its position, in reality, is fundamentally at odds with Congress' intent in enacting the Act.

Congress enacted CIPA to minimize the problem of "graymail," whereby a defendant threatens to disclose classified information in the course of trial in an attempt to force the government to drop the prosecution. By permitting a court to determine before trial whether "classified information at issue is admissible and in what form it may be introduced", CIPA enables "the government to ascertain [before trial] the potential damage to national security [associated] with a given prosecution" so that it can intelligently decide whether "the prosecution is sufficiently important to incur the national security risks." S.Rep. No. 96–823, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code, Cong. & Ad.News 4294, 4297, 4300.

■ Although CIPA is designed to prohibit the defendant from needlessly disclosing irrelevant classified information, it was not intended to deny the defendant use of relevant and admissible classified information. In determining the admissibility of classified information, the court must apply the standards generally applicable to evidence in federal court. Congress did not intend to compromise, in the interests of national security, the defendant's right to adduce evidence to which he would otherwise be entitled. As the drafters of CIPA stated:

A defendant should not be denied the use of information that he would otherwise use simply because of the procedures of this bill. [O]n the question of a standard of admissibility of evidence at trial, the committee intends to retain current law regardless of the sensitivity of the information.

1980 U.S.Code, Cong. & Ad.News at 4301. H. Conference Rep. No. 96–1436, 96th Cong., 2d Sess. *reprinted in* 1980 U.S. Code, Cong. & Ad.News at 4310 ("the conferees agree that, [as noted in both the House and Senate reports], nothing in the conference substitute is intended to change the existing standards for determining relevance and admissibility"). *See also U.S. v. Wilson,* 586 F.Supp. 1011 at 1013 (S.D.N.Y. 1983); *U.S. v. Collins,* 720 F.2d 1195, 1199 (11th Cir.1983). Once the court makes a determination under § 6(a) that classified information is admissible, the prosecution may seek to avoid or minimize disclosure of sensitive information by exercising its options under 6(c) & (e) of the Act,[14] or by dismissing the indictment. Rather than permitting the Court to exclude otherwise admissible evidence due to its sensitivity, the Act properly leaves the task of protecting the national security to the executive branch.

Despite CIPA's unambiguous legislative history, the government urges the Court to give special treatment to the admissibility of classified information. It does not argue that the Court should, or could, preclude Smith from testifying to his version of events. Rather, based on the asserted unbelievability of Smith's account and the sensitivity of classified information, it argues only for the exclusion of classified information. The government's position is inconsistent with Congress' clearly ex-

---

**14.** Once the court determines that an item of classified information is admissible, the government, under § 6(c) of the Act, may ask the court to substitute either a summary or an admission of relevant facts. The court must permit the substitution if it "will provide the defendant with substantially the same ability to make his defense as would disclosure of specific classified information."

Where the court denies the government's request for a § 6(c) substitution, the government can require the court to order the defendant not to disclose the classified information. 18 U.S.C. App. § 6(e). Upon issuing such an order, the court must dismiss the indictment or take other less drastic action, "as the court determines is appropriate."

The government is entitled to take an interlocutory appeal of any order of the district court "authorizing the disclosure of classified information, imposing sanctions for nondisclosure of classified information, or refusing a protective order ...." 18 U.S.C.App. § 7.

The government may, of course, always dismiss the indictment if, after exercising its rights under the Act, it determines that the prosecution would involve an unacceptably high risk to the national security.

pressed intent that, "in making its rulings on admissibility, the Court is to disregard the fact that certain material may be classified." *U.S. v. Wilson, supra*, at 1013.[15]

■■■ In an attempt to square its position that only classified information should be excluded with CIPA's intent that the admissibility of classified information be governed by generally applicable rules of evidence, the government misinterprets the relevance rules. Federal Rule of Evidence 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by "the danger of unfair prejudice." The government argues that the harm to national security flowing from disclosure of classified information is a component of "unfair prejudice" within the meaning of Rule 403. As used in the rule, however, "prejudice" refers to the effect the information will have on the finder of fact, not, as the government suggests, on events outside the courtroom such as the national security. Fed.R.Evid. 403, Notes of Advisory Committee ("unfair prejudice ... means an undue tendency to suggest *decision* on an improper basis") (emphasis added). A court is ill-equipped to determine, and a defendant without means to challenge, the extent to which disclosure of particular items of classified information would damage the national security. Assuming the court could evaluate such harm, it would be unable to balance the harm against the defendant's need for the information in any honest and meaningful way. Indeed, if the government's interpretation were correct, Rule 403 would require the court automatically to exclude classified information. The interests of the entire nation, by definition, always "substan-

tially outweigh" the interest of a single individual in a given item of classified information. In addition to raising serious constitutional questions, this result would undercut the clear intent of CIPA. The drafters of CIPA spoke to this very issue, directing courts not to engage in the one-sided balancing proposed by the government;

> It should be emphasized, however, that the court should not balance the national security interests of the Government against the rights of the defendant to obtain the information.

1980 U.S.Code, Cong. & Ad.News at 4303.[16] For all of these reasons, the Court holds that "unfair prejudice" within the meaning of Rule 403 refers to the effect information will have on the judicial truth-finding process, not to potential harm to the national security.

■■■ The government further argues that Rules 402 and 403 permit the Court to consider the credibility of evidence in determining whether it is relevant and admissible. In exceptional cases a court may have very limited authority to exclude evidence on the ground that no rational trier of fact could believe it. *See infra.* But apart from this narrow situation, not present here, the court may not consider credibility in determining the admissibility of evidence. Our Anglo-American system of jurisprudence, as set forth in the Federal Rules of Evidence and the Constitution, requires the trier of fact to evaluate the credibility of witnesses and other evidence. The government, like all parties in our system, has a right to impeach and cross-examine adverse witnesses. Yet the protec-

---

**15.** The court went on to state:
> Both documentary and testimonial evidence containing classified matter may be admitted if in conformity with the Federal Rules of Evidence.

Id. *See also* 126 Cong.Rec. H9308 (Sept. 22, 1980) (statement of Rep. Mazzoli) (the Act "does not alter the existing standards for determining relevance or admissibility").

**16.** The Senate Committee made this statement in explaining § 6(e)(2), a section that permits the court to dismiss the indictment or take other

appropriate action in cases where the Attorney General has decided to prohibit the defendant from disclosing particular items of admissible classified information at trial. Section 6(e) comes into play only *after* the court has determined that the classified information in question is admissible. The fact that, in considering its alternatives under § 6(e), the court may not weigh the national security against the defendant's rights implies *a fortiori* that the court may not do so in determining the admissibility of classified information.

tions available to it do not extend so far as to permit the exclusion of evidence on the basis of a judicial determination that it lacks credibility.[17]

■ The government's argument that the court may consider credibility in deciding admissibility sweeps more broadly than the government perhaps desires. The alleged incredibility of Smith's account of the facts would not provide a basis for excluding only classified evidence; it strikes at the very heart of Smith's defense. The government's position, if accepted, consequently requires that Smith be precluded from adducing any evidence, whether classified or not, in support of his factual defense.

The government cannot, consistent with CIPA's intent and generally applicable principles of evidence, concede that Smith's testimonial recital of his factual defense may be admitted but at the same time argue that classified information corroborative of his defense must be excluded. The Act, together with the Federal Rules of Evidence, require the Court to rule either that competent evidence supporting Smith's factual defense is generally admissible or that such evidence is categorically inadmissible.

For reasons delineated below, the Court holds that evidence offered in support of Smith's factual defense, whether classified or not, is generally admissible.

■ The government's characterization of Smith's defense as a patent fabrication raises, by implication, the doctrine of inherent incredibility. 3 Weinstein's Evidence ¶ 601[01], at 601–09 (1981 & Supp.1984). In criminal cases, the doctrine, which permits a court to exclude evidence because a reasonable juror could not accept it as credible, has been invoked exclusively by defendants seeking to avoid the testimony of government witnesses. *See, e.g., U.S. v. Rodriguez*, 702 F.2d 38, 43 (2d Cir.1983); *U.S. v. Duhon*, 565 F.2d 345 (5th Cir.1978).

As far as this Court can determine, no federal court has ever excluded evidence proffered by a criminal defendant on the ground of inherent incredibility. Indeed, a cluster of interrelated constitutional considerations casts serious doubt on the authority of the court to invoke the doctrine to preclude a criminal defendant, or his witnesses, from giving testimony.

■ A criminal defendant has a constitutional right to insist that the government prove his guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). A court must accordingly set aside an unreasonable verdict of guilty, that is, a verdict not supported by evidence sufficient to permit a jury to find all essential elements of the charged crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Applied against government witnesses, the doctrine of inherent incredibility safeguards against an unreasonable verdict of guilty. In this context, then, the constitutionality of the doctrine is undoubted. In fact, it may be constitutionally required.

■ The same constitutional concerns that support application of the doctrine against government witnesses militate against its application in the context of defense witnesses. The reasonable doubt standard reflects a policy judgment, firmly embedded in our system of criminal justice, that it is better for a guilty person to go unpunished that for an innocent person to unjustly suffer the loss of liberty and stigmatization associated with a criminal conviction. A series of important constitutional requirements spring from this policy. Whereas the defendant has a right to demand a reasonable verdict of guilty, the government has no corresponding right to insist on a reasonable verdict of acquittal:

> [T]he factfinder in a criminal case has traditionally been permitted to enter an

---

**17.** The government cites *U.S. v. Wilson, supra,* in support of its contention that CIPA, in conjunction with the Federal Rules of Evidence, permit the court to consider credibility in deter-

mining the admissibility of classified information. The Court rejects the *Wilson* decision if it is read as contrary to the principles set forth in this Opinion.

unassailable but unreasonable verdict of "not guilty." This is the logical corrollary of the rule that there can be no appeal from a judgment of acquittal, even if the evidence of guilt is overwhelming.

*Jackson v. Virginia*, 443 U.S. at 317 n. 10, 99 S.Ct. at 2788 n. 10. Consequently, while a court may direct a verdict of acquittal, the constitution will not permit it to direct a verdict of guilty, or to make a ruling that tends to have this effect, "regardless of how overwhelmingly the evidence may point [towards guilt]." *U.S. v. Martin Linen Supply Co.*, 430 U.S. 564, 572–73, 97 S.Ct. 1349, 1355, 51 L.Ed.2d 642 (1977); *U.S. v. Hayward*, 420 F.2d 142 (D.C.Cir. 1969); *U.S. v. Musgrave*, 444 F.2d 755 (5th Cir.1971) (instruction that tends to direct a verdict for the prosecution constitutes plain error). *See also U.S. v. McClain*, 545 F.2d 988, 1004 (5th Cir.1977); *U.S. v. England*, 347 F.2d 425, 430 (7th Cir.1965). Further, unlike a verdict of guilty, a verdict of· acquittal may not be appealed, even if based on an egregiously erroneous foundation. *Sanabria v. U.S.*, 437 U.S. 54, 77, 98 S.Ct. 2170, 2185, 57 L.Ed.2d 43 (1978). This rule, described by the Supreme Court as "[p]erhaps the most fundamental rule in the history of double jeopardy jurisprudence", is, like the reasonable doubt standard, designed in part to reduce the possibility that an innocent person may be found guilty. *U.S. v. Martin Linen Supply Co.*, 430 U.S. at 569, 97 S.Ct. at 1353; *Green v. U.S.*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957) (retrial enhances the possibility that an innocent person may be found guilty). All of these specific rules reflect and implement the policy of giving the accused the benefit of error, even if the error is unreasonable.

■■■ The doctrine of inherent incredibility, as applied against government witnesses, advances the fundamental policy of providing special protections so that the accused will not be unjustly convicted. Ap-

plied against defense witnesses, however, the doctrine undercuts this policy by depriving the accused of evidence which, if believed, would exculpate him. *See Zemina v. Solem*, 438 F.Supp. 455, 468 (D.S.D. 1977). It would seem to follow that, if it applies at all, the doctrine should be construed more narrowly when invoked against defense witnesses.

Although this conclusion might be interpreted as requiring courts to employ a "double standard" in evaluating evidence offered by the prosecution and by the defense, analogous double standards are found throughout criminal procedure. As discussed above, for example, the rights of the prosecution and the defense are asymetrical with respect to directed verdicts and appeals. Similar asymetries exist in the law of evidence. Federal Rule of Evidence 404(a)(1), for example, prohibits the prosecution from introducing evidence of a pertinent character trait of the accused in its case-in-chief to prove that he committed the charged crime. The same rule, however, permits an accused to introduce character evidence in an attempt to establish his innocence. This rule cannot be persuasively explained on the ground that character evidence used to establish guilt is less relevant or more prejudicial than character evidence used to establish innocence. There is no reason to believe that jurors are more likely to convict on the basis of character evidence than they are to acquit on the same type of evidence. The most persuasive justification for the rule lies in the policy that it is worse for an innocent person to suffer unjustly than it for a guilty person to go free. This explains why the prosecution may not use evidence that tends to unduly increase the likelihood of conviction but the accused may use the same type of evidence tending to unduly increase the likelihood of acquittal.[18] Rule 404(a) thus supports the conclusion that the doctrine of inherent incredibility should be construed more narrowly, or abandoned al-

---

18. A similar analysis applics with respect to Rule 404(a)(2).

together, in the context of defense witnesses.[19]

In addition to the fundamental policy, discussed above, arising from the reasonable doubt standard and Rule 404(a), two other constitutional considerations argue strongly in favor of narrowing the doctrine of inherent incredibility in the case of defense witnesses. First, a criminal defendant is entitled to take the stand in his own defense in federal court. Congress long ago abolished the common law rule that a criminal defendant is incompetent to testify in his own behalf, 18 U.S.C. § 3481, and, under the prevailing view, the accused's right to testify in his own defense has a constitutional foundation. *See U.S. v. Bifield*, 702 F.2d 342, 349 (2d Cir.1983); *Alicea v. Gagnon*, 675 F.2d 913, 920–23 (7th Cir.1982). By excluding an accused's testimony on the ground that it is inherently unbelievable, the court runs the risk that it will deny the defendant's right to testify on his own behalf. That danger is especially acute here. The core of the government's case consists of confessions Smith made to FBI agents. The government will, in effect, put Smith on the stand by having FBI agents recount his confessions. Fed. R.Evid. 801(d)(2). The defendant's right to testify in his own defense is especially important in this situation. Where the defendant's confessions are introduced through the testimony of others, surely his right to testify guarantees him an opportunity personally to present his version of events and, as in this case, to explain prior inconsistent confessions. The Court rejects the government's suggestion that Smith may testify to his version of events but may not introduce evidence substantiating his testimony. To be meaningful, the defendant's right to testify on his own behalf necessarily implies a right to introduce additional competent evidence in support of a defense. *See Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967) (accused has a fundamental due process right "to present his own witnesses to establish a defense"); *U.S. v. Bifield*, 702 F.2d 342, 349 (2d Cir.1983).

Second, the Sixth Amendment provides that an accused shall enjoy the right to a trial by jury. The right to a jury trial, a right particularly important in criminal prosecutions, requires that the jury determine all issues of fact that bear on the ultimate determination of the defendant's guilt or innocence. *Sandstrom v. Montana*, 442 U.S. 510, 523, 99 S.Ct. 2450, 2458, 61 L.Ed.2d 39 (1979); *Duncan v. Louisiana*, 391 U.S. 145, 156, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968); *Ford v. U.S.*, 273 U.S. 593, 606, 47 S.Ct. 531, 535, 71 L.Ed. 793 (1927); *U.S. v. Barletta*, 644 F.2d 50, 58 (1st Cir.1981); *U.S. v. Berrigan*, 482 F.2d 171, 175 (3d Cir.1973); *U.S. v. Shober*, 489 F.Supp. 393, 403 (E.D.Pa.1979); Fed.R. Crim.P. 12(b)(1); 1 Wright, Federal Practice and Procedure § 194, at 715 (1982). It is within the exclusive province of the jury to decide the validity and credibility of the testimony of all witnesses, including the defendant. In *U.S. v. Bailey*, 444 U.S. 394, 414–15, 100 S.Ct. 624, 636–37, 62 L.Ed.2d 575 (1980), the Supreme Court described the fact-finding role of the jury:

> The Anglo-Saxon tradition of criminal justice embodied in the United States Constitution and in federal statutes, makes jurors the judges of the credibility of testimony offered by witnesses. It is for them, generally, and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story.

As this description implies, courts have been extremely careful not to usurp the jury's exclusive prerogative to find facts

---

**19.** Chief Judge Weinstein makes much the same point in the context of Rule 602 of the Federal Rules of Evidence, which requires that the proponent of the evidence make a prima facie showing that the witness has personal knowledge. After explaining that Rule 602 permits a court to exclude a witness' testimony where no reasonable person could find that the witness actually perceived the matter about which he is testifying, *see* note 22 *infra*, he cautions:

> In a criminal case where the proponent is the defense, the court should hesitate even more than in other instances in excluding testimony on Rule 602 grounds.

3 Weinstein's Evidence ¶ 602[02], at 602–5 (1981).

and to make credibility determinations. Indeed, the defendant's Sixth Amendment right to a jury trial is designed to protect him for arbitrary law enforcement, ranging from overzealous or politically motivated prosecutors to "complaint, biased or eccentric judges." *Duncan.* A court accordingly may not, for instance, direct a verdict of guilty, or take action that tends to have that effect, "no matter how conclusive the evidence in the case may be." *U.S. v. Hayward,* 420 F.2d 142 (D.C.Cir.1969). *See supra.* Consequently, where the defendant presents evidence which, if believed, would constitute a valid defense, the court is constitutionally required to instruct the jury on the defense, "even though the evidence may be weak, insufficient, *inconsistent, or of doubtful credibility.*" *U.S. v. Lewis,* 592 F.2d 1282, 1286 (5th Cir.1979) (quoting *U.S. v. Parker,* 566 F.2d 1304, 1305 (5th Cir.1978)) (emphasis added). *See also U.S. ex rel. Peery v. Sielaff,* 615 F.2d 402, 403 (7th Cir.1979); *U.S. v. Garner,* 529 F.2d 962, 970 (6th Cir.1976); *Strauss v. U.S.,* 376 F.2d 416, 419 (5th Cir.1967); *Zemina v. Solem,* 438 F.Supp. 455, 468 (D.S.D. 1977). The virtually unqualified deference courts have shown to the role of the criminal jury in deciding issues of fact and credibility strongly suggests that the doctrine of inherent incredibility should be invoked only in the most extraordinary circumstances, and perhaps not at all, in the case of defense witnesses.[20]

The doctrine of inherent unbelievability arguably can be reconciled with the constitutional rights discussed above by interpreting them as limited to the right to present *competent* evidence to the jury. While this definitional move seemingly solves all, it misses the point. The important point is that the court must define "competent evidence" broadly so as to afford the defendant his constitutional rights and to preserve the historic role of the criminal jury in deciding matters of credibility. The constitutional considerations discussed above—the reasonable doubt requirement and implementing rules, the defendant's right to testify on his own behalf, and his right to a jury trial—combine to cast serious doubt on the Court's authority to rule the testimony of a defendant or other defense witnesses unbelievable as a matter of law. Indeed, the Court has been unable to find a single case where a court has so ruled. But even assuming *arguendo* that the doctrine may be applied against defense witnesses in some circumstances, it is inapplicable on these facts.

Even as applied against government witnesses, the doctrine of inherent unbelievability has been narrowly construed in criminal cases. While the cases recognize the doctrine in theory, they almost uniformly refuse to hold the challenged testimony unbelievable as a matter of law. *E.g., U.S. v. Rodriguez,* 702 F.2d 38, 43 (2d Cir.1983); *U.S. v. Shulman,* 624 F.2d 384, 388 (2d

**20.** Given that both the government and the defendant have a right to insist on a jury trial, it might be argued that there is no reason to construe the doctrine of inherent incredibility more narrowly in the case of defense witnesses. These rights, however, do not have equal status. In contrast with the defendant's constitutional right to a jury trial, the government's right occupies a less exalted position in our system of criminal justice. It is a statutory right that must be flexibly interpreted to accommodate the defendant's more fundamental rights, such as the constitutional right to require the government to establish guilt beyond a reasonable doubt. *Cf. Singer v. U.S.,* 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965) (reserving question of whether government's insistence on jury trial may in some circumstances deny defendant's right to an impartial trial). In the case of government witnesses, the court implements the reasonable doubt standard by removing evidence of doubtful credibility from the jury's consideration. But, as developed in the text, applying the doctrine in the case of defense witnesses runs contrary to the policy reflected by the reasonable doubt requirement. Moreover, our system of jurisprudence acknowledges that the jury has special importance for the criminal defendant by giving him a constitutional right to a jury. As the Supreme Court has observed, the primary purpose of the criminal jury is to provide the accused with a bulwark against governmental oppression. *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). In light of jury's role in protecting the defendant from "arbitrary law enforcement" of all kinds, including "compliant, biased, or eccentric judges", courts must be especially wary of taking the testimony of defense witnesses away from the jury. Id.

Cir.1980); *U.S. v. Strahl,* 590 F.2d 10, 12 (10th Cir.1978); *U.S. v. Duhon,* 565 F.2d 345 (5th Cir.1978); *U.S. v. Cravero,* 530 F.2d 666, 670 (5th Cir.1976); *Lyda v. U.S.,* 321 F.2d 788, 794–95 (9th Cir.1963); *Haakinson v. U.S.,* 238 F.2d 775 (8th Cir.1956); *U.S. v. Narciso, supra.* In *Cravero,* for instance, the government witness had consistently lied in the past, had engaged in criminal activities, thought that his testimony would benefit him and showed elements of mental instability. Even though the government's entire case rested on the testimony of this witness, the court declined to rule the testimony incredible as a matter of law. Cases holding the testimony of a government witness unbelievable as a matter of law are exceedingly rare.[21] The doctrine has been reserved for cases where the witnesses testimony contradicts indisputable physical facts or laws. As the Fifth Circuit has stated the test:

Only when testimony is so unbelievable on its face that it defies physical laws should the court intervene and declare it incredible as a matter of law.

*U.S. v. Lerma,* 657 F.2d 786, 789 (5th Cir. 1981) (Unit A) (citing cases).[22] *Accord U.S. v. Mack,* 695 F.2d 820 (5th Cir.1983); *U.S. v. Narciso,* 446 F.Supp. 252, 282–83 (E.D. Mich.1977).[23]

It is clear that the doctrine, so defined, does not apply here. This is not a case where the proffered testimony contradicts unalterable physical fact, as where the witness could not possibly have observed what he claims to observe or his testimony defies physical laws. *See Southern Pacific Co. v. Matthews,* 335 F.2d 924 (5th Cir.1964) (civil case); *Ferrar v. U.S.,* 275 F.2d 868, 869, 876–77 (D.C.Cir.1959). *See also Wood v. U.S.,* 342 F.2d 708, 713 (8th Cir.1965). Smith's current explanation of events is consistent with the indisputable physical facts and laws. For this rea-

---

**21.** *See U.S. v. Wood,* 342 F.2d 708, 713 (8th Cir.1965); *Farrar v. U.S.,* 275 F.2d 868, 869, 876–77 (D.C.Cir.1959).

**22.** Conceived in this way, the doctrine of inherent incredibility overlaps Federal Rule of Evidence 602 to some extent. Rule 602, which requires that a witness have personal knowledge of the matter to which he testifies, permits the court, in circumstances especially limited in the case of defense witnesses, *see* note 19 *supra,* to exclude testimony on the ground that a rational fact finder could not believe that the witness has personal knowledge. 3 Weinstein's Evidence ¶ 602[02] (1981). The doctrine of inherent incredibility sweeps more broadly than Rule 602, however, because, unlike Rule 602, the doctrine of inherent incredibility directly addresses the credibility of the substance of the witness' testimony. Even though it is conceded that the witness perceived the matter about which he testifies, the doctrine of inherent incredibility would permit his testimony to be excluded if the substance of his testimony defies physical laws. In other words, the doctrine operates where the witness perceived the subject about which he testifies but he is lying about what he, in fact, perceived. Rule 602 is narrower. It comes into play only when the witness lacked the capacity to perceive the subject matter about which he testifies—where, for example, uncontradicted evidence shows that the witness was blind or deaf when he supposedly made his observations.

In this case there is no suggestion that Smith lacked the claimed opportunity to observe, lis-

ten, and speak to White and Ishida. His senses were evidently functional and he asserts, without dispute, that he was present at locations where he alleges White and Ishida were present.

**23.** The rule was defined more broadly in *Jackson v. U.S.,* 353 F.2d 862, 867 (D.C.Cir.1965):

Sometimes, it is possible to disprove testimony as a matter of logic by the uncontradicted facts or by scientific evidence. [citations omitted] But the doctrine of inherent incredibility does not require such positive proof. It is enough to invoke the doctrine if the person whose testimony is under scrutiny made allegations which seem highly questionable in light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave.

Although *Jackson* is a criminal case, it is distinguishable. There the court was reviewing a fact finding made by a judge on an issue other than the defendant's guilt/innocence. Because there was thus no right to a jury trial on this particular issue, the court deliberately employed a more searching standard of review. 353 F.2d at 864–65. Where, as here, the disputed issues of fact go to the ultimate issue of guilt/innocence, a court must accord more deference to the role of the fact-finder.

Even accepting *Jackson's* expansive interpretation of the doctrine of inherent incredibility, the doctrine may not be applied on these facts. *See infra.*

son alone, the doctrine of inherent incredibility does not apply.

■ The government nevertheless maintains that it is inconceivable that, if Smith had actually believed he spoke to Okunev at the behest of the CIA, he would not have disclosed this fact to the FBI agents who interviewed him. In the government's view, there is an irreconcilable conflict between Smith's current statements and his undisputed prior actions that renders his current statements unbelievable as a matter of law. The caselaw makes clear, however, that where an inconsistency arises from a witness' prior statements or actions, the jury, not the court, must determine which version shall prevail. *See California v. Green*, 399 U.S. 149, 157–161, 90 S.Ct. 1930, 1935–37 (1970); *U.S. v. Greene*, 578 F.2d 648, 657 (5th Cir.1978); *U.S. v. Barber*, 442 F.2d 517, 522 (3d Cir.1971). Further, Smith has made no secret of his intention to explain at trial his failure to mention to his alleged connection with the CIA during his FBI interviews. He asserts that because he was convinced that the CIA would disavow any affiliation with his activities, disclosure of a CIA connection would have been, at best, pointless and, at worst, harmful to his case. This explanation is not utterly devoid of plausibility. If Smith thought that the CIA would deny any connection with him, a rational juror could conclude that he feared assertion of a CIA connection would make him look foolish in the eyes of the FBI. There is, moreover, some evidence that the CIA would have and did disavow any affiliation with him, either because it had decided to "cut him loose" or because it was ignorant of the activities of White, Ishida and their alleged CIA superior. He has proffered evidence that the CIA agent who allegedly directed his double agent project often acted independently, without obtaining prior authorization. He further says that one of his witnesses will testify that the CIA does, in fact, disclaim any affiliation with double agents in certain circumstances. Disclosure of his CIA connection, he moreover maintains, would have violated a secrecy pact he made with the CIA, a pact that, as

a former military intelligence officer, he felt under a special obligation to uphold. This is thus not a case where a witness' more recent statements contravene, without explanation, prior statements or actions. While the credibility of Smith's explanation may be suspect, it is clearly not unbelievable as a matter of law.

The government adverts to another fact that it maintains renders Smith's account inherently unbelievable. In June of 1983 in San Francisco, Smith called FBI agent Paul Shields, a former bishop in his church, and asked Shields to put him in touch with the CIA. He met with a CIA agent later that day, telling the agent that he had met with the Soviets in Japan and, in exchange for $11,000, had disclosed useless information. In the government's view, Smith's contention that he had disclosed information at the direction of the CIA is hopelessly inconsistent with the circumstances surrounding his contact with the CIA in San Francisco. Smith, the government points out, evidently did not assume that the CIA was familiar with his story. Rather, he told it as though he believed that the CIA had had no connection with, or knowledge of, his activities. Viewing the evidence in the light most favorable to Smith, however, a reasonable juror could conclude that Smith's contact with the CIA in San Francisco is not inconsistent with his factual defense. Smith has represented that he left messages for, and was recontacted by, Ken White on a regular basis. Beginning in April 1983, however, Smith says that White did not return the messages he left for White. As Smith tells it, he became worried that the CIA had "cut him loose." Based on this evidence, a reasonable juror could infer that Smith's approach of the CIA in San Francisco was, at least initially, an attempt to reestablish contact with the CIA. Once it became apparent that the CIA was not prepared to acknowledge his activities, a juror might infer, Smith decided to maintain a cautious silence concerning his connection with CIA agents White and Ishida. Alternatively, a rational juror might infer that Smith approached the CIA

in an attempt to learn whether the CIA had in fact disassociated itself from him. Under this view, Smith was understandably silent about his CIA connection because he was attempting to discover whether the CIA would voluntarily acknowledge, or claim ignorance of, the connection. In light of these reasonable inferences, Smith's approach of the CIA in San Francisco does not render his account unbelievable on its face.

In short, Smith's account of the facts is not so internally inconsistent that it could not create a reasonable doubt as to his guilt in the mind of a reasonable juror.

The Court also notes that there is independent evidence tending to corroborate Smith's story. [remainder of paragraph deleted due to classified information]

[paragraph deleted due to classified information]

[paragraph deleted due to classified information]

Viewing all of this evidence in the light most favorable to Smith, a reasonable juror could draw inferences that would corroborate his story.

Smith's account of events is not so internally inconsistent that a rational juror could not believe it. His failure to mention his CIA defense to the CIA in San Francisco and to the FBI during his interviews does not render his account wholly unbelievable. In addition, he is prepared to adduce independent evidence in support of his defense.

In conclusion, the Court, based on the alternative holdings summarized below, declines to invoke the doctrine of inherent incredibility to categorically preclude Smith from adducing evidence in support of his defense. First, the Court holds that the doctrine of inherent incredibility may not be applied to exclude the testimony of a criminal defendant or his witnesses.[24] Second, the Court assumes *arguendo* that the doctrine, as defined in cases involving the testimony of prosecution witnesses, may be used against defense witnesses. So defined, the doctrine does not apply in this case because Smith's account of events does not contradict physical laws. Third, the Court holds that the doctrine of inherent incredibility must be construed more narrowly than in the case of government witnesses. The second holding implies *a fortiori* that the doctrine does not apply here. Fourth, the Court assumes *arguendo* that, contrary to the above, the doctrine applies wherever a rational juror, for whatever reason, could not believe a witness. Under this interpretation, the court may exclude evidence not only because it contradicts physical laws but also because it defies "common sense."[25] Even given this expansive interpretation, the doctrine does not apply here. Smith's account of events is not necessarily internally inconsistent. In addition, there is independent evidence corroborating Smith's story. Thus, drawing all inferences in Smith's favor, a rational juror, based on the evidence Smith intends to adduce at trial, could legitimately entertain a reasonable doubt as to his guilt.

**24.** This holding is necessarily a limited one. The Court, of course, does not hold that the federal rules of evidence may never be applied to disadvantage a criminal defendant. *Cf. Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (application of a state variant of hearsay rule held to violate defendant's due process rights); *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). The Court does not hold that evidence offered by a criminal defendant must be admitted despite the rules concerning competency, personal knowledge, relevance and hearsay. *E.g.,* Fed.R.Evid. 401, 403, 601, 602, 801. The Court holds only that once these threshold requirements have been met, the constitutional considerations discussed *supra,* in combination, preclude the Court from excluding evidence on the ground that it lacks credibility.

**25.** Although the doctrine has been defined this broadly in some civil cases, it must be defined more narrowly in criminal cases. Criminal cases involve constitutional constraints not present in civil cases, the most prominent of which is perhaps the reasonable doubt requirement. In addition, as the Supreme Court has recognized, the right to a jury trial plays an especially important role in criminal cases. *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

It is entirely possible, of course, that the government's probing cross-examination and overwhelming rebuttal evidence might reduce Smith's factual defense to shambles. Nevertheless, there is a legitimate conflict of evidence that the jury is entitled to resolve. *See U.S. v. McCrae*, 459 F.2d 1140 (D.C.Cir.1972); *U.S. v. Beck*, 615 F.2d 441 (7th Cir.1980). Once the Court determines that evidence meets minimum standards of credibility, if any exist, its task is at an end. As the Supreme Court has declared:

> The established safeguards of an Anglo-American legal system leave the veracity of a witness to be detected by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.

*Hoffa v. U.S.*, 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966). Smith's account of events is not unbelievable as a matter of law. Whether his account can withstand the acid tests of impeachment, cross-examination, and rebuttal is for a jury to decide.

## C. Conclusion

The Court holds that Smith may testify to his version of events and present any other evidence, whether classified or not, tending to corroborate his defense. A contrary holding would violate CIPA, federal rules of evidence and the Federal Constitution. By refusing to permit Smith to testify to his factual defense, the Court would be denying Smith his right to take the stand in his own defense. That right is especially compelling here because the government, in effect, intends to put Smith on the stand in the form of confessions he made to FBI agents. By excluding competent evidence that directly bears on the issue of guilt, the Court would deny Smith his right to a jury trial. Exclusion of such evidence would have the effect of directing a verdict of guilty against Smith, a practice that is strictly forbidden by the Constitution. And, finally, by depriving him of evidence which, if believed, establishes his innocence, the Court would deny Smith his right to raise a reasonable doubt as to his guilt in the minds of jurors.

## III. INSCOM INFORMATION

■ Defense counsel have indicated that they do not intend to introduce any classified information concerning INSCOM operations as part of their case-in-chief. Smith will, of course, testify that White and Ishida, who held themselves out as CIA agents, authorized him to disclose secret INSCOM information so that he could establish a relationship with the Soviets. On direct, he will not discuss details of INSCOM operations. Rather, he intends to say only that, upon questioning, White and Ishida revealed details about the operations that, based on knowledge acquired while he was with INSCOM, he knew to be true. Because counsel do not intend to explore classified details, there are no CIPA issues with respect to this aspect of Smith's testimony.

In compliance with their § 5 notice obligations, however, defense counsel have designated several items of classified information that they might need to explore in response to the government's cross-examination and rebuttal case. Although the government has indicated that its cross-examination and rebuttal will be extremely limited as to the INSCOM material, the Court, in accordance with the objectives of CIPA, will rule on the designated items so that the government can have the maximum possible guidance.

Details concerning INSCOM operations are generally admissible if they are relevant to information White and Ishida allegedly told Smith. This is true whether or not Smith, as a result of his employment with INSCOM, had prior knowledge of the items of information.

Evidence showing that Smith had prior knowledge of details White and Ishida allegedly revealed to him corroborates Smith's assertion that he believed White and Ishida's alleged representations, both as to their bona fides and as to the significance of the INSCOM information. [sentence deleted due to classified information]

Smith's knowledge of this fact, if established, tends to corroborate his assertion that he believed White and Ishida's representation that the operation had been discontinued.

Details of INSCOM operations White and Ishida allegedly conveyed to Smith may also be admitted despite the fact that Smith had no prior knowledge of them. This type of evidence is admissible to confirm the truth of information White and Ishida allegedly communicated to Smith. The truth of such information may be shown because it makes the existence of White and Ishida more probable than would otherwise be the case. Fed.R.Evid. 401. Smith alleges, for example, that White and Ishida told him that several INSCOM operations had been discontinued. If, in fact, the operations had not been discontinued, a rational juror could conclude that Smith's story is a fabrication. If White and Ishida existed and were CIA agents, a juror might reason, surely they would have had accurate information. This line of reasoning demonstrates that the truth/falsity of the information White and Ishida alleged communicated to Smith is relevant to his defense.

Evidence concerning INSCOM operations that does not relate to information White and Ishida allegedly communicated to Smith is inadmissible.

Assuming that the proper foundation is laid, the INSCOM files which contain relevant information may be admissible as business records under Federal Rule of Evidence 803(6). Under the hearsay rule, information contained in the reports is admissible only if: (1) the information reflects the personal observations of the person making the report; (2) the information is not offered to prove the truth of the matter therein asserted; or (3) comes within another exception to the hearsay rule.

With these general guidelines in the mind, the Court rules the following items inadmissible:

(1) Royal Miter, FN4183. White and Ishida could not possibly have conveyed this information to Smith—it refers to events occuring after he allegedly met with White and Ishida.

(2) Royal Miter, FN4159–62, 4185, 4193, 4473, 4475. The issue of whether Smith actually harmed this country by disclosing information to the Soviets is irrelevant. Under the statute, only Smith's state-of-mind is irrelevant.

(3) Royal Miter, FN4671, 4473, 4475. Inadmissible unless there is evidence that White and Ishida communicated this information to Smith.

(4) Royal Miter, FN4075-last ¶, 4485. Inadmissible to prove that the asset was paid the indicated sum. May be admitted to show that the indicated sum did not surprise the case officer who made the report.

(5) Royal Miter, FN4201, 4204, 4243. Irrelevant to any possible issue in the case.

The remainder of the material may possibly be brought within the guidelines enunciated above.

## IV. BISHOP, BALDWIN INFORMATION

Smith alleges that White and Ishida gave him a Honolulu telephone number where he could leave messages for them. He assertedly called this number several times, leaving messages for White who, as a result, either contacted him by phone or arranged to meet him. Although he did not know this at the time, the number Smith allegedly called, (808–531–4189), is associated with the now defunct Honolulu investment firm Bishop, Baldwin, Rewald, Dillingham & Wong....

[the remainder of this section has been deleted because it is inextricably intertwined with classified information]

## V. [This section has been deleted due to classified information]